# 14-2481-CV

# United States Court of Appeals

*for the*

# Second Circuit

KIND LLC,

*Plaintiff-Appellant,*

– v. –

CLIF BAR & COMPANY,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

DEBEVOISE & PLIMPTON LLP
*Attorneys for Plaintiff-Appellant*
919 Third Avenue
New York, New York 10022
(212) 909-6000

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, and to enable the Court to evaluate possible disqualification or recusal, Plaintiff-Appellant KIND LLC, by its undersigned counsel, certifies that it is a private non-governmental party, that its corporate parent is KIND INC., a private non-governmental company, and that no publicly held corporation owns 10% or more of KIND INC.'s or KIND LLC's stock.

<u>/s/ *David H. Bernstein*</u>
David H. Bernstein

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ...................................................1

STATEMENT OF ISSUES PRESENTED.............................................1

STATEMENT OF THE CASE...........................................................3

SUMMARY OF ARGUMENT .........................................................4

FACTUAL BACKGROUND .............................................................9

    KIND Bars And Their Trade Dress.............................................9

    Clif's Intentional Copying Of The KIND Trade Dress................................10

    Confusion Evidence.................................................................13

    Irreparable Harm....................................................................13

STANDARD OF REVIEW ............................................................16

ARGUMENT ...............................................................................16

    I.    The District Court Made Errors Of Law In Its Analysis Of Whether The KIND Trade Dress Is Inherently Distinctive. ...............16

        A.    The District Court Relied On An Erroneous Conception Of The Trade Dress At Issue. ...................................................16

        B.    It Was Error To Refuse To Consider The Overall Look Of KIND's Packaging. ...............................................................18

        C.    The District Court Failed To Apply This Court's Precedent Establishing The Inherent Distinctiveness Of Trade Dress. ............................................................20

        D.    The District Court Compounded Its Error By Considering The Elements Constituting The Trade Dress Individually Rather Than Considering The Overall Impression Conveyed By Their Combination. ...........................................20

        E.    The District Court Failed To Recognize The Well-Established Distinction Between Product Configuration And Product Packaging In Trade Dress Law. ..........................22

i

II.    The District Court's Analysis Of Secondary Meaning Was
       Fatally  Tainted By The Same Legal Errors Underlying Its
       Analysis Of Inherent Distinctiveness..................................................27

III.   Errors of Law In The District Court's Analysis Of The
       Likelihood of Confusion Also Require Remand.................................31

       A.    The Foregoing Errors Tainted The District Court's
             Analysis Of the Strength Of KIND's Trade Dress. .................31

       B.    The District Court Relied On A Misapplication Of
             Second Circuit Precedent In Its Similarity Analysis. .............32

       C.    The District Court Improperly Discounted KIND's
             Survey Evidence. .....................................................................36

IV.    The Foregoing Errors Fatally Tainted The District Court's
       Analysis Of Irreparable Harm, The Balance Of Hardships And
       The Public Interest............................................................................44

CONCLUSION ........................................................................................46

# TABLE OF AUTHORITIES

**CASES**

*Abercrombie & Fitch Co. v. Hunting World, Inc.*,
  537 F.2d 4 (2d Cir. 1976) ................................................................38

*Am. Express Fin. Advisors Inc. v. Thorley*,
  147 F.3d 229 (2d Cir. 1998) .............................................................16

*Best Cellars Inc. v. Grape Finds at Dupont, Inc*,
  90 F. Supp. 2d 431 (S.D.N.Y. 2000). ................................................35

*Bristol-Myers Squibb Co. v. McNeil-PPC, Inc.*,
  973 F.2d 1033 (2d Cir. 1992) .....................................................*passim*

*Cartier, Inc. v. Sardell Jewelry, Inc.*,
  294 F. App'x 615 (2d Cir. 2008) ...............................................22, 40

*Conopco, Inc. v. Cosmair, Inc.*,
  49 F. Supp. 2d 242 (S.D.N.Y. 1999) ...............................................35

*EnergyBrands Inc. v. Beverage Mktg. USA, Inc.*,
  No. 02 Civ. 3227 (JSR), 2002 WL 826814 (S.D.N.Y. May 1, 2002) ...............36

*Fruit-Ices Corp. v. Coolbrands Int'l Inc.*,
  335 F. Supp. 2d 412 (S.D.N.Y. 2004) ...............................................34

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*,
  111 F.3d 993 (2d Cir. 1997) .....................................................*passim*

*Funrise Canada (HK) Ltd. v. Zauder Bros., Inc.*,
  No. 99-CV-1519 (ARR), 1999 WL 1021810 (E.D.N.Y. July 2, 1999) .............34

*Harlequin Enterps., Ltd. v. Gulf & W. Corp.*,
  644 F.2d 946 (2d Cir. 1981) .............................................................30

*Jeffrey Milstein, Inc. v. Gregor, Lawlor, Roth, Inc.*,
  58 F.3d 27 (2d Cir. 1995) .........................................................24, 32

*Knitwaves, Inc. v. Lollytogs Ltd. Inc.*,
  71 F.3d 996 (2d Cir. 1995) .......................................................23, 24

*Kraft General Foods, Inc. v. Allied Old English, Inc.*,
    831 F. Supp. 123 (S.D.N.Y. 1993) ...................................................36

*Kraft General Foods, Inc. v. Friendship Dairies, Inc.*,
    No. 91 Civ. 2276 (KC), 1991 WL 149755 (S.D.N.Y. June 26, 1991) ..............36

*L. & J.G. Stickley, Inc. v. Canal Dover Furniture, Co.*,
    79 F.3d 258 (2d Cir. 1996) ......................................................29

*Landscape Forms, Inc. v. Columbia Cascade Co.*,
    113 F.3d 373 (2d Cir. 1997) ................................................*passim*

*LeSportsac, Inc. v. K Mart Corp*,
    754 F.2d 71 (2d Cir. 1985). ..............................................21, 22, 40

*Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*,
    426 F.3d 532 (2d Cir. 2005) ....................................................16

*Mana Prods. v. Columbia Cosmetics Mfg.*,
    65 F.3d 1063 (2d Cir. 1995) .....................................................39

*McNeil-PPC, Inc. v. Merisant Co.*,
    Civ. No. 04-1090 (JAG), 2004 WL 3316380 (D.P.R. July 29, 2004)...............34

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,
    164 F.3d 736 (2d Cir. 1998) ..............................................23, 24, 35

*Paddington Corp. v. Attiki Imps. & Distribs., Inc.*,
    996 F.2d 577 (2d Cir. 1993) ................................................*passim*

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010) ......................................................44

*Stormy Clime Ltd. v. ProGroup, Inc.*,
    809 F.2d 971 (2d Cir. 1987) .....................................................24

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*,
    532 U.S. 23 (2001) ..............................................................24

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
    529 U.S. 205 (2000).......................................................19, 23, 24, 25

*Warner-Lambert Co. v. Northside Dev. Corp.*,
    86 F.3d 3 (2d Cir. 1996) ...................................................................44

*Yurman Design, Inc. v. PAJ, Inc.*,
    262 F.3d 101 (2d Cir. 2001) ......................................................24, 25

**STATUTES**

15 U.S.C. § 1114, *et seq.*...................................................................1, 18, 20

28 U.S.C § 1292 ......................................................................................1

28 U.S.C. § 1331 ......................................................................................1

28 U.S.C. § 1338 ......................................................................................1

28 U.S.C. § 1367 ......................................................................................1

**OTHER AUTHORITIES**

Federal Rule of Appellate Procedure 4(a)(1)(A) ....................................1

Appellant Kind LLC ("KIND") appeals from the Opinion & Order of the U.S. District Court for the Southern District of New York (Wood, J.), issued on June 12, 2014 (Special Appendix ("SPA") 1), denying KIND's motion for a preliminary injunction to enjoin Defendant-Appellee Clif Bar & Company ("Clif") from selling and promoting its MOJO snack bars in a newly-designed packaging that is confusingly similar to the distinctive packaging used for KIND's healthy snack bars.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338 & 1367 because the action arose under the federal Lanham Act.  15 U.S.C. § 1114, *et seq.*  This Court has jurisdiction over this appeal pursuant to 28 U.S.C § 1292(a)(1) because this is an appeal from the District Court's order refusing to grant a preliminary injunction.  This appeal is timely pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A).  KIND filed its notice of appeal on July 7, 2014, *see* Joint Appendix ("JA") 1155, within 30 days of the District Court's order of June 12, 2014.

## STATEMENT OF ISSUES PRESENTED

(1)    Did the District Court err as a matter of law when it refused to consider the protectability as a trade dress of the overall look of KIND's packaging and instead: (a) defined KIND's trade dress as encompassing only the six points of

similarity between the parties' respective packaging identified in KIND's complaint, (b) compounded the error by considering each of those six individual elements one-by-one rather than considering the overall combination, and (c) concluded that the "trade dress" (as incorrectly defined) was not protectable because many of the six individual elements serve a functional purpose?

(2)    Did the District Court's failure to comprehend properly the nature of trade dress protection (as set forth above) fatally infect the District Court's analysis of inherent distinctiveness and lead to the erroneous conclusion that the KIND trade dress is "descriptive"?

(3)    Did the District Court's failure to comprehend properly the nature of trade dress protection (as set forth above) fatally infect the District Court's analysis of acquired distinctiveness ("secondary meaning")?

(4)    Did the District Court's failure to comprehend properly the nature of trade dress protection (as set forth above) fatally infect the District Court's analysis of likelihood of confusion?

(5)    Was the District Court's erroneous analysis of likelihood of confusion further compounded by other errors of law—including (a) erroneous extension of this Court's holding in *Bristol-Myers Squibb Co. v. McNeil-PPC, Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992), to the facts of this case, and (b) failure to analyze properly KIND's survey evidence?

(6)     Did the District Court's legal errors described above fatally infect the District Court's analysis of irreparable harm?

(7)     Did the District Court's legal errors described above fatally infect the District Court's analysis of the alternative standard for a preliminary injunction?

(8)     Should the District Court's Opinion & Order be vacated and the case remanded to the District Court to consider the evidence in light of the correct legal principles?

## STATEMENT OF THE CASE

KIND brought this action to enjoin Clif from selling its MOJO snack bars in a newly-designed packaging that is confusingly similar to the distinctive packaging used for KIND's healthy snack bars.

KIND filed its complaint on February 6, 2014, and, shortly thereafter, moved for an order preliminarily enjoining Clif from selling or promoting Clif MOJO bars in the challenged trade dress. Following briefing and limited expedited document discovery, the Court held an evidentiary hearing on KIND's motion for a preliminary injunction.

On June 12, 2014, the District Court denied KIND's motion for a preliminary injunction. The District Court held that KIND's trade dress had neither inherent nor acquired distinctiveness, that consumer confusion was

unlikely, and that KIND did not face a risk of irreparable harm absent injunctive relief.  *See* SPA 1.

## SUMMARY OF ARGUMENT

The fundamental error at the heart of the District Court's analysis—which infected virtually every aspect of the District Court's opinion—was its legally erroneous conception of the nature of the trade dress protection at issue.

Consistent with the precedent of this Court and the U.S. Supreme Court, KIND sought to protect its trade dress—namely, the ***overall look of its packaging***. Although KIND's complaint and motion papers highlighted six points of similarity between the KIND trade dress and the challenged MOJO trade dress, KIND was always clear that it sought to protect the overall look of its packaging, not an abstract selection of six elements in isolation. The six points of similarity were highlighted only to help illustrate why the overall look of the MOJO packaging was deceptively similar to the overall look of the KIND packaging; at no point did KIND indicate that its trade dress was limited to just those six elements.

The District Court, however, expressly refused to consider the protectability of the overall look of the KIND packaging.  SPA 2 n.1 ("the Court rejects KIND's attempt" to seek protection for the overall look of its packaging).  Instead, the District Court insisted on defining the KIND trade dress as consisting only of the six points of similarity which KIND had identified between the KIND and MOJO

trade dresses.  *Id.* at 1–2 & n.1.  Having defined the trade dress to consist of an abstraction comprised of six elements (rather than the overall look of the packaging as it actually appears in the marketplace), the District Court then compounded its error by proceeding to analyze each of those six elements individually.  *Id.* at 5–6.  Finding that many of the individual elements are used by others, or serve some functional or descriptive purpose, the District Court concluded that the "trade dress"—defined improperly as the abstract collection of six elements—is not inherently distinctive.  *Id.* at 6.

The District Court's approach is contrary to well established precedent of this Court and the U.S. Supreme Court:

- The District Court's express refusal to consider the overall look of the packaging is contrary to binding precedent establishing that the overall look of a product packaging is precisely what should be the focus of inquiry in such a case.

- The District Court disregarded ample binding precedent holding that the overall impression conveyed by product packaging is almost always inherently distinctive and therefore protectable even where certain individual elements contributing to that overall impression are used by others, functional, or descriptive.

- The District Court, by considering each of the elements individually and holding that the overall trade dress is not inherently distinctive because some of those elements are used by others, functional, or descriptive, failed to follow this Court's precedent that specifically rejected such an approach but instead requires the trade dress—including any such elements—to be considered as a whole.

It appears that the reason that the District Court erroneously refused to consider the overall look of the KIND packaging is that the District Court failed to recognize the clear distinction between product configuration and product packaging articulated in this Court's trade dress jurisprudence.  This Court has repeatedly instructed the district courts that product packaging trade dress and product configuration trade dress are to be analyzed differently.  In product configuration cases, it is necessary to articulate what elements of the overall product a plaintiff asserts are source identifying, while in product packaging cases such articulation is unnecessary because the product's packaging *as a whole* is intended to be source identifying.  The District Court relied on product configuration precedent, inapplicable to this product packaging case, to support its erroneous refusal to consider the protectability of the overall look of KIND's packaging as trade dress.

The District Court's legally erroneous refusal to consider the protectability of the overall look of KIND's packaging also fatally infected the District Court's analysis of secondary meaning.  KIND put forth ample undisputed evidence of the type usually held sufficient to establish secondary meaning, such as federal registrations of the KIND trade dress, evidence of over $600 million in sales and over $100 million in marketing expenditures for KIND bars bearing their trade dress, and evidence of intentional copying of the KIND trade dress.  But the

6

District Court held that KIND's evidence was irrelevant because it related to the overall look of the KIND packaging (which the District Court refused to consider) rather than to the abstract collection of six elements which the District Court insisted should be the focus of inquiry. Had the District Court focused correctly on the KIND packaging as a whole, it almost certainly would have found that the packaging has acquired secondary meaning since KIND's evidence of secondary meaning was unrebutted.

The District Court's legally erroneous refusal to consider the protectability of the overall look of KIND's packaging also fatally infected the District Court's analysis of likelihood of confusion, irreparable harm, and the balance of the equities. The likelihood of confusion analysis was expressly premised, at least in part, on the District Court's erroneous conclusion that the KIND trade dress (as improperly defined by the District Court) lacked distinctiveness or secondary meaning. The likelihood of confusion analysis was marred by additional errors detailed in Section III of the Argument, below. The District Court's conclusions as to irreparable harm and the balance of the equities were also expressly premised on the District Court's erroneous holdings with respect to distinctiveness and likelihood of confusion.

As a practical matter, the District Court's misunderstanding of the nature of the trade dress protection at issue may be due to the District Court's inconsistent

consideration of the issue during the proceedings below.  After both KIND and

Clif had put on their respective cases-in-chief (but before KIND's rebuttal case),

the District Court indicated that it had already decided that KIND had succeeded in

proving the distinctiveness of its trade dress.  JA 706 (5/1 Tr. 443:13–20).  The

District Court's statement arose as part of a colloquy in which the District Court

gave the parties guidance on how they should focus their closing arguments.

Indeed, KIND's counsel expressly asked whether he should address

distinctiveness of the trade dress in his closing and was told by the District Court

that the District Court was already satisfied on that issue.  *Id.*  As a result, KIND

did not focus extensively on the distinctiveness of its trade dress in its case in

rebuttal, closing arguments or post-hearing briefing, assuming that the District

Court was satisfied on the issue, and instead focused on likelihood of confusion.  It

was therefore surprising that the District Court's Opinion concluded that the KIND

trade dress is not distinctive.  Had the District Court voiced its questions on this

issue instead of expressly instructing counsel that it would be unnecessary to

address the issue, perhaps the District Court's fatal misunderstanding of the issue

could have been avoided.

KIND now finds its entire brand placed in serious jeopardy.  The District

Court's broad ruling that the KIND trade dress is not protectable is a clarion call to

would-be infringers that they may try to copy the KIND trade dress with impunity.

Thus, in addition to seeking relief to prevent the ongoing irreparable harm caused by the continued presence of Clif's infringing MOJO product in the marketplace, KIND urgently seeks to undo the permanent, and potentially devastating, injury to its brand caused by the District Court's erroneous holding as to the protectability of the KIND trade dress.

Accordingly, KIND respectfully requests that this Court vacate the District Court's Opinion & Order and remand the case to the District Court to consider the evidence in light of the correct legal principles.

## FACTUAL BACKGROUND

### KIND Bars And Their Trade Dress

KIND is a market leader in the fast-growing nutritional snack bar category. When it launched its KIND bars a decade ago, it transformed the category. Unlike most other leading nutritional snack bars, KIND's healthy snack bars are made from all-natural, nutritionally-rich "ingredients you can see and pronounce," such as whole nuts, dried fruits, and honey. JA 205–06 ¶ 8. To emphasize KIND's use of simple, whole ingredients, as well as to create a distinctive, sleek, modern impression on store shelves, KIND designed an innovative and distinctive trade dress that prominently featured a large rectangular window, bisected by a horizontal stripe containing the flavor of the bar in text, among other distinctive features. JA 203 ¶ 3.

KIND submitted evidence in the District Court, most of which was undisputed, showing that the KIND trade dress is distinctive and has become singularly associated with the KIND brand in the minds of relevant consumers. KIND has obtained two federal registrations with the U.S. Patent & Trademark Office covering elements of the trade dress.  JA 206–07 ¶ 11.  The renown of the trade dress is further evidenced by KIND's sales of over 450 million bars bearing the trade dress, including current sales in excess of 10 million bars per week; marketing expenditures of more than $100 million resulting in one billion media impressions of KIND bars bearing their trade dress; and unsolicited media attention and accolades for KIND's innovative and distinctive trade dress.  JA 47 (4/28 Tr. 44:9–44:10), 50 (4/28 Tr. 47:3–7), 207–09 ¶¶ 13 & 16–17, 229–30 ¶ 20. Evidence of KIND's sales and marketing and of the unsolicited media attention and accolades enjoyed by the KIND trade dress was all ***entirely uncontroverted*** in the District Court.

## Clif's Intentional Copying Of The KIND Trade Dress

In February 2014, Clif launched a re-formulated version of its MOJO snack bars in re-designed packaging which mimics the distinctive look of the packaging of KIND bars.



As shown above, JA 203 ¶ 3, 224–25 ¶ 12, the new MOJO trade dress mimics several key elements of the unique and distinctive KIND trade dress, including (1) packaging with a transparent, rectangular front panel revealing a large portion of the bar itself; (2) a horizontal stripe bisecting the transparent front panel containing the flavor of the bar in text; (3) a text description of the product line (e.g. "Fruit & Nut," "Plus," or "Nuts & Spices") in line with the horizontal stripe bisecting the transparent front panel; (4) a vertical black band, offset to the side of the package, containing a bulleted list of many of the bar's key healthful attributes; (5) opaque vertical bands, or end caps, at either edge of the product package; and (6) a 40g size, in a slender shape.  Due to the confluence of striking similarities, the overall impression conveyed by the new MOJO trade dress is confusingly similar to the overall impression conveyed by the KIND trade dress.

The evidence submitted to the District Court demonstrated that the deceptively similar look of the MOJO trade dress did not occur by chance, but

rather resulted from Clif's intentional strategy to copy.  The record is replete with evidence that Clif used the KIND trade dress as a model in designing the MOJO wrappers.  The MOJO re-design team "agreed that KIND is a ***best in class packaging that [they] should learn from*** for Mojo," JA 556 (emphasis added).  The brand manager for MOJO and the point person for Clif on the re-design strategy, Kim Dao, admitted that the Clif team brought KIND wrappers to meetings during the redesign process (and she did not identify any other brands of wrappers that also were studied in their meetings).  JA 542 (4/30 Tr. 273:15–18).  Clif's internal "Packaging Objectives" design brief for the "Mojo Packaging Refresh" stated expressly Clif's intention to achieve a ***"[s]imilar window shape & coloring to Kind***," JA 564 (emphasis added), and Ms. Dao admitted that the design team did indeed have that objective.  JA 532, 534 (4/30 Tr. 263:4–263:7, 265:17–266:4).  Even the District Court acknowledged that "Clif Bar's internal documents during the MOJO redesign period [indicate] that Clif Bar deliberately copied elements of the KIND trade dress for its new MOJO trade dress."  SPA 7.

Clif's internal documents demonstrate that when the re-design process was complete, Clif itself recognized that its re-designed wrapper and in-store promotional materials for MOJO were now "***too close to KIND.***"  JA 560 (emphasis added).  Clif forged ahead with the launch of its re-formulated, re-packaged MOJO product anyway.

**Confusion Evidence**

KIND presented strong evidence of confusion before the District Court, including both a consumer survey and anecdotal evidence. KIND's survey expert, George Mantis, conducted a scientific, controlled survey intended to measure the likelihood of confusion among consumers in the marketplace. JA 236 ¶ 4. The survey followed a format that has been accepted as valid and probative by the U.S. District Court for the Southern District of New York on several occasions, *see id.* ¶ 6, and even Clif's survey expert agreed that the general format and methodology used by Mr. Mantis were appropriate. JA 512 (4/30 Tr. 311:10–18), 577. As further detailed in Section III.C of the Argument, Mr. Mantis' work demonstrates that an appreciable number of relevant consumers have the mistaken belief that the re-designed MOJO product comes from or is affiliated with KIND, and Mr. Mantis' use of a valid control allowed him to conclude with scientific precision that such confusion is specifically caused by the MOJO trade dress.

**Irreparable Harm**

KIND also made a detailed showing of why it would suffer irreparable harm in the absence of injunctive relief. The evidence submitted to the District Court showed that about 63% of KIND's consumers have tried the bar only once, twice or sporadically. JA 963 (5/6 Tr. 473:13–473:22), 1092. Moreover, nearly 85% of the adult consuming population has never heard of KIND or are not KIND

consumers at all.  JA 967 (5/6 Tr. 477:10–13), 1092.  The key to KIND's growth is

getting people who have never heard of or tried the brand to try it, and then getting

the sporadic and occasional consumers to graduate into loyal consumers.  JA 984

(5/6 Tr. 494:13–18).  But those who are not yet loyal are the very consumers most

prone to confusion and who are least likely to have awareness of the various

brands in the market.  JA 955, 969–971 (5/6 Tr. 465:6–24, 479:6–481:20), 1092,

1096.  They may have tried a KIND bar at a friend's house, picked it up in the

airport or as an impulse purchase at a convenience store for a quick snack, and they

may be just as likely (if not more so) to remember it by its attractive, distinctive

packaging as by its name.  JA 956 (5/6 Tr. 466:11–14).

Nearly half of all stores in which KIND bars are sold reflect retail

environments, like convenience stores, in which these products are impulse

purchases.  JA 982–84 (5/6 Tr. 492:16–494:12), 1091.  Additionally, the other half

of stores in which KIND bars are merchandised often offer the bars for impulse

purchase, sometimes in more than one location in each store.  JA 982–84 (5/6 Tr.

492:16–494:12), 1091.  In these retail environments, the universe of potential

KIND consumers is practically unlimited—the impulse environment is

affirmatively designed to attract those customers with little or no familiarity with

the product type.  JA 962–63 (5/6 Tr. 472:14–473:25).

When a consumer who tried a KIND bar in one impulse environment (such as an airport or at the checkout counter in a grocery store) and liked it later goes to another impulse environment (such as a convenience store) to look for the KIND bar product, the consumer may notice the similar packaging and mistakenly buy a MOJO bar, thinking that it is the same thing or is affiliated.  JA 955 (5/6 Tr. 465:6–24).  If the consumer has a different experience from the one he or she had with the KIND bar, KIND may lose that opportunity to win a new customer and graduate that customer into becoming a loyal customer.  JA 956–57 (5/6 Tr. 466:15–467:3).  Adding such new customers to the rapidly expanding healthy snack bar market has been the key to KIND's growth.  JA 967–68 (5/6 Tr. 477:23–478:4).  But these are the customers least likely to discern between similar packages.  JA 968 (5/6 Tr. 478:5–11).  If KIND's growth slows as a result of losing or failing to attract and graduate these customers due to confusion—slowing KIND's growth being Clif's stated "strategic intent" in its packaging design, JA 564—the harm to KIND would be vast, but would be, practically speaking, immeasurable.

Clif did not offer any evidence to rebut this showing that irreparable harm is likely.

## STANDARD OF REVIEW

On the appeal of a denial of a motion for preliminary injunction, the district court's conclusions of law are reviewed *de novo*. *See Am. Express Fin. Advisors Inc. v. Thorley*, 147 F.3d 229, 231 (2d Cir. 1998) ("Questions of law decided in connection with requests for preliminary injunctions . . . receive the same *de novo* review that is appropriate for issues of law generally."). Although the overall standard of review applicable to denial of a preliminary injunction motion is "abuse of discretion," this Court recognizes that a district court inherently abuses its discretion when it rules based on erroneous legal conclusions. *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005). Accordingly, where, as here, the basis of appeal is that the district court ruled on the basis of erroneous legal conclusions, the ***effective*** standard of review is *de novo*.

## ARGUMENT

## I.    The District Court Made Errors Of Law In Its Analysis Of Whether The KIND Trade Dress Is Inherently Distinctive.

### A.    The District Court Relied On An Erroneous Conception Of The Trade Dress At Issue.

KIND sought to protect as a trade dress the ***overall look of its packaging***. [*See, e.g.,* Docket Entry ("DE") 40, KIND Pre-Hearing Reply, at 2 ("This case is about the overall look of KIND's trade dress, not any individual element")].

16

Indeed, the District Court acknowledged that KIND sought to protect the overall look of its packaging and that KIND had called attention to six particular elements only to highlight the points of similarity between the KIND and MOJO trade dresses.  SPA 2 n.1 ("'[A]lthough KIND pointed out the six specific elements that directly contribute to the overall infringing impression created by the MOJO wrapper, it has consistently argued that it is ultimately the ***overall*** impression of the packaging, rather than the individual elements, that is at issue.'") (quoting DE 73, KIND Post-Hearing Reply, at 2).

But the District Court refused to consider the protectability of the overall look of the KIND packaging.  SPA 2 n.1 ("the Court rejects KIND's attempt" to seek protection for the overall look of its packaging).  Instead, the District Court insisted on defining the KIND trade dress as consisting only of the six points of similarity that KIND had identified between the KIND and MOJO trade dresses. *Id.* at 1–2 & n.1.  The District Court repeatedly insisted that KIND could seek protection in those six elements alone, rather than in its packaging as a whole, *see, e.g.*, *id.* at 5-6, despite having acknowledged that KIND sought to protect "something more"—*i.e.*, the overall look of its packaging.  *Id.* at 2 n.1.

To be clear:  The District Court ***never*** considered the protectability of the overall look of the KIND packaging that KIND sought to protect as a trade dress; it expressly refused to do so.  That is, the District Court ***never*** considered the

protectability of the trade dress which actually exists as a tangible packaging in the marketplace, on store shelves and depicted in advertisements and other promotional materials.  Rather, the District Court stated that it was considering the protectability only of an abstraction made up of six elements.  *Id.* at 2 n.1.

Having defined the trade dress as consisting solely of these six elements in isolation (rather than the overall look of the package), the District Court then compounded its error by proceeding to analyze each of those six elements individually.  *Id.* at 5–6.  Although the District Court paid lip-service to the notion that the overall impression conveyed by the combination of elements should be the focus of the distinctiveness inquiry, *see id.* at 4, the District Court never considered the overall impression conveyed by the combination of elements and instead examined each element, one-by-one, to determine whether each served any functional or descriptive purpose.  *Id.* at 5-6.  The District Court found that many of them did, and the District Court therefore held that the trade dress—defined as the abstract collection of six elements—is "descriptive" and therefore not inherently distinctive.  *Id.* at 6.

## B.    It Was Error To Refuse To Consider The Overall Look Of KIND's Packaging.

It is well established that the trade dress for product packaging—its "total image"—is protectable under Section 43(a) of the Lanham Act, 15 U.S.C.

18

§ 1125(a). *See Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 582-84 (2d Cir. 1993) (protecting trade dress of ouzo bottle based on its overall appearance); *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1042 (2d Cir. 1992) ("In examining trade dress the focus is on the ***entire*** look of the product or packaging.").

Distinctiveness of a trade dress is determined by considering the "total impression" made by the trade dress, rather than its individual elements. *Paddington*, 996 F.2d at 584. This Court has recognized that the overall look of a product's packaging is the appropriate focus of the distinctiveness assessment because consumers typically identify products by their packaging. *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1000 (2d Cir. 1997) ("Consumers generally rely on packaging for information about the product and its source."); *see also Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 212 (2000) ("The attribution of inherent distinctiveness to . . . product packaging derives from the fact that the very purpose of . . . encasing [a product] in a distinctive packaging[] is most often ***to identify the source*** of the product.") (emphasis added).

The District Court's refusal to consider the protectability of the overall look of KIND's packaging (despite acknowledging that that is what KIND sought to protect) was contrary to the clear precedent of this Court that the overall look of the packaging is the appropriate focus of inquiry.

### C.   The District Court Failed To Apply This Court's Precedent Establishing The Inherent Distinctiveness Of Trade Dress.

The District Court's refusal to consider the protectability of the overall look of KIND's packaging also caused the District Court to disregard this Court's precedents recognizing that a product's overall packaging will almost always be inherently distinctive because the choices available to a manufacturer in packaging its product are virtually limitless. *Paddington*, 996 F.2d at 583 ("Since the choices that a producer has for packaging its products are . . . almost unlimited, typically a [packaging] trade dress will be arbitrary or fanciful and thus inherently distinctive . . . ."); *Fun-Damental Too, Ltd.*, 111 F.3d at 1000 ("[T]he varieties of labels and packaging available to wholesalers and manufacturers are virtually unlimited. As a consequence, a product's trade dress typically will be arbitrary or fanciful and meet the inherently distinctive requirement for § 43(a) protection."); *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 379 (2d Cir. 1997) ("[T]his circuit appears to be moving toward a rule that packaging is usually indicative of a product's source . . . .").

### D.   The District Court Compounded Its Error By Considering The Elements Constituting The Trade Dress Individually Rather Than Considering The Overall Impression Conveyed By Their Combination.

Having erred by defining the trade dress as an abstraction comprised of six elements rather than the overall package which actually exists in the marketplace,

the District Court compounded its legal error by analyzing each of those six elements individually.  SPA 5–6.  The District Court concluded that, because many of those individual elements served a functional purpose, and many individual elements were used by others, the trade dress could not be inherently distinctive. *Id.* at 5.  Instead, the District Court determined the abstract trade dress it analyzed was "descriptive" because each element was descriptive of the KIND product.  *Id.* at 6.  In so holding, the District Court followed an approach to analyzing the distinctiveness of trade dress which this Court has repeatedly held to be inappropriate.  In *Paddington*, for example, this Court's landmark product packaging case, this Court explained:

> Trade dresses often utilize commonly used lettering styles, geometric shapes, or colors, or ***incorporate descriptive elements*** . . . .   While each of these elements ***individually*** would not be inherently distinctive, it is the ***combination*** of elements and the total impression that the dress gives to the observer that should be the focus of a court's analysis of distinctiveness. . . .   One could no more deny protection to a trade dress for using commonly used elements than one could deny protection to a trademark because it consisted of a combination of commonly used letters of the alphabet.

*Paddington*, 996 F.2d at 584 (emphasis added).  Similarly, this Court explained in *LeSportsac, Inc. v. K Mart Corp.*:

> [B]y breaking [plaintiff's] trade dress into its individual elements and then attacking certain of those elements as functional, [defendant] misconceives the scope of the appropriate inquiry.  [Plaintiff] does not claim a trademark in all lightweight nylon bags using hollow zipper pulls or carpet tape trim.   It claims as its mark the particular

> combination and arrangement of design elements that identify its bags
> and distinguish them from other bags.

754 F.2d 71, 76 (2d Cir. 1985), *abrogated on other grounds as stated in*, *Bristol-Myers*, 973 F.2d at 1042; *accord Cartier, Inc. v. Sardell Jewelry, Inc.*, 294 F. App'x 615, 620–21 (2d Cir. 2008) ("[I]t [i]s improper for defendants to break the trade dress down into specific elements and call them functional, because plaintiffs' claim is that the combination and arrangement of those design elements comprise the trade dress at issue.").

Thus, in addition to refusing to consider the tangible trade dress which actually exists in the world (as this Court's jurisprudence directs), and in addition to disregarding precedent that packaging is almost always inherently distinctive, the District Court compounded its errors by doing precisely what this Court has instructed district courts not to do: it concluded that the abstract "trade dress" which it considered is not inherently distinctive because individual elements, considered in isolation, are functional, used elsewhere, or descriptive of the product.  SPA 5–6.

### E.   The District Court Failed To Recognize The Well-Established Distinction Between Product Configuration And Product Packaging In Trade Dress Law.

It appears that the reason that the District Court erroneously refused to consider the overall look of the KIND packaging is that the District Court failed to recognize the clear distinction between product configuration and product

packaging articulated in this Court's trade dress jurisprudence. The District Court relied on product configuration precedent, inapplicable to this product packaging case, to support its erroneous refusal to consider the protectability as a trade dress of the overall look of KIND packaging. *See* SPA 2 n.1 (citing *Landscape Forms*, 113 F.3d 373).

The U.S. Supreme Court has instructed courts to "distinguish between product design and product packaging" when assessing trade dress cases. *Wal-Mart Stores*, 529 U.S. at 215. This Court has long recognized this same distinction, instructing the district courts to treat product packaging trade dress and product configuration trade dress differently. *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 743 n.5 (2d Cir. 1998) ("Product configuration trade dress is judged differently, *see Landscape Forms* . . . , but [the plaintiff's] bottle properly is considered packaging, *see Paddington* . . . ."); *Knitwaves, Inc. v. Lollytogs Ltd. Inc.*, 71 F.3d 996, 1007 (2d Cir. 1995) ("We do not find the analysis of *Paddington* appropriate in the case before us, in which the trade dress at issue consists of a product's features . . . rather than, as in *Paddington*, a product's packaging.").

This distinction has resulted in two distinct lines of cases in this Court's trade dress jurisprudence: (1) those that address product configuration trade

dresses,[1] and (2) those that address product packaging trade dresses.[2]  In product configuration cases, this Court has required plaintiffs to "articulate the design elements that compose the trade dress." *Yurman*, 262 F.3d at 116.  That is, the plaintiff must explain which elements of their product "serve[] to identify [their] product with its manufacturer or source." *TrafFix*, 532 U.S. at 28.

This requirement is appropriate in product configuration cases because trade dress protection should not be used to prevent copying of useful product features, but rather is aimed solely at prohibiting competitors from using source-identifying features "in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods." *Id.*  The Supreme Court has emphasized that "product design almost invariably serves purposes other than source identification," *Wal-Mart Stores*, 529 U.S. at 213, and has therefore repeatedly cautioned against "misuse or overextension of trade dress" in product configuration cases.  *TrafFix*, 532 U.S. at 29.  Recognizing this same risk, this Court has emphasized that plaintiffs seeking protection for their product configuration under the Lanham Act

---

[1]  *See Landscape Forms*, 113 F.3d 373 (outdoor furniture); *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101 (2d Cir. 2001) (jewelry); *Knitwaves*, 71 F.3d at 1007 (sweaters); *Jeffrey Milstein, Inc. v. Gregor, Lawlor, Roth, Inc.*, 58 F.3d 27 (2d Cir. 1995) (greeting cards); *Stormy Clime Ltd. v. ProGroup, Inc.*, 809 F.2d 971, 972 (2d Cir. 1987) (rainjackets); *see also TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001) (traffic signs).

[2]  *See Paddington*, 996 F.2d 577 (ouzo bottle); *see also Nora Beverages*, 164 F.3d 736 (water bottle); *Fun-Damental Too*, 111 F.3d 993 (novelty toy box).

must affirmatively identify the aspects of the design that are, in fact, source-identifying. *Landscape Forms*, 113 F.3d at 381 ("[A] plaintiff's inability to explain to a court exactly which aspects of its ***product design(s)*** merit protection may indicate that its claim is pitched at an improper level of generality, i.e., the claimant seeks protection for an unprotectable style, theme or idea.") (emphasis added). By requiring plaintiffs to articulate their product configuration trade dress with specificity, courts are able to prevent plaintiffs from seeking protection in components of their product design that are "altogether too broad to be . . . source-identifying . . . ." *Yurman*, 262 F.3d at 118; *see also Landscape Forms*, 113 F.3d at 380 ("[G]ranting trade dress protection to an ordinary product design would create a monopoly in the goods themselves.").

The same concerns are not present in cases, like this one, involving product packaging, as both this Court and the Supreme Court have recognized. That is because "product packaging . . . normally *is* taken by the consumer to indicate origin . . . ." *Wal-Mart Stores*, 529 U.S. at 215; *see also Fun-Damental Too*, 111 F.3d at 1001 ("[C]onsumers are more likely to rely on the packaging of a product than on the product's design as an indication of source."). Plaintiffs in product packaging cases therefore are not required to articulate with specificity each individual element of their packaging that they assert are indicative of source, particularly where the ***entire package*** is asserted to be source-identifying. *See,*

*e.g.*, *Fun-Damental Too*, 111 F.3d at 997, 1001 (referencing appended images of the novelty toy boxes in question and considering "total impression" of the package "as seen by consumers" to constitute trade dress at issue, not any articulation of elements offered by plaintiff); *Paddington*, 996 F.2d at 581, 584 (referencing appended images of the ouzo bottles in question and considering the "overall appearance" of the bottles as constituting the trade dress at issue, not any articulation of elements offered by plaintiff).

Even where, as here, the packaging allows the consumer to see the product, that does not convert the case into a product configuration case. In *Fun-Damental Too*, for example, this Court considered a packaging for novelty toys designed to allow consumers to see the toy inside. 111 F.3d at 1001. This Court held that, so long as the plaintiff does not seek to prevent competition from the competing product itself, "it [is] appropriate to consider the packaging in conjunction with the product" without transforming the case into one regarding product configuration. *Id.* ("Because the box is open in order to display the product, it was proper to analyze [Plaintiff's] trade dress as seen by consumers—including the [novelty toy] product. Further, there is no risk of 'spillover' protection for the [novelty toy] as a product here since the injunction is limited to the sale of a similar product in a ***particular*** package, rather than an absolute ban on the sale of the [competing novelty toy] in an open-style box."). In this case, KIND never claimed that it

26

should be protected from competition from Clif's derivative **_product_**, only that

Clif's derivative product should not be sold in packaging that is confusingly

similar to the overall look of KIND's **_packaging_**.

The District Court in this case did not recognize the distinction—well

established in this Court's trade dress jurisprudence—between product

configuration and product packaging cases.  The District Court relied exclusively

on product configuration precedent to support its erroneous refusal to consider the

protectability of the overall look of the KIND packaging.  *See* SPA p. 2 n.1 (citing

*Landscape Forms*, 113 F.3d 373).

## II.    The District Court's Analysis Of Secondary Meaning Was Fatally Tainted By The Same Legal Errors Underlying Its Analysis Of Inherent Distinctiveness.

The District Court's legally erroneous refusal to consider the protectability

of the overall look of KIND's packaging also fatally infected the District Court's

analysis of secondary meaning.

KIND put forth ample undisputed evidence of the type usually held

sufficient to establish secondary meaning, such as the federal registrations of the

KIND trade dress, evidence of over $600 million in sales and over $100 million in

marketing expenditures for KIND bars bearing their trade dress, and evidence of

intentional copying of the KIND trade dress.  But the District Court held that

KIND's evidence was irrelevant because it related to the overall look of the KIND

packaging (which the District Court refused to consider) rather than to the abstract collection of six elements which the District Court erroneously insisted should be the focus of inquiry.  More specifically, the District Court held that KIND's evidence was meaningless because it was impossible to tell whether the extensive sales, marketing and media exposure for KIND bars enhanced consumer recognition of the abstract collection of six elements only or, instead, enhanced consumer recognition of the KIND packaging as a whole.  SPA 8 ("KIND fails to establish that its sales, marketing and advertising expenditures, and unsolicited media coverage have resulted in consumers associating *the six elements it seeks to protect* as its trade dress with KIND.") (emphasis added).

The District Court's observation—that sales, marketing and media attention redound to the benefit of the packaging as a whole, rather than to an abstraction comprised of some elements of it—is almost certainly correct, but that observation only underscores why it was erroneous for the District Court to refuse to consider the packaging as a whole.  It is precisely because of the impossibility of assessing whether individual elements of a plaintiff's trade dress are source-identifying when divorced from the trade dress as a whole that this Court has *repeatedly* instructed the district courts *not* to break down a plaintiff's trade dress into its individual elements as the District Court did here.  *Fun-Damental Too*, 111 F.3d at 1001 ("We evaluate trade dress distinctiveness by looking at all its elements and

considering the total impression the trade dress gives to the observer."); *Paddington*, 996 F.2d at 584 ("[I]t is the combination of elements and the total impression that the dress gives to the observer that should be the focus of a court's analysis of distinctiveness."); *Bristol-Myers*, 973 F.2d at 1042 ("In examining trade dress the focus is on the *entire* look of the product or packaging.").

The District Court held KIND's secondary meaning evidence up to an impossible standard. It is hard to imagine that a brand owner would ever be able to demonstrate that sales, marketing, and media exposure for its product enhanced recognition only of the aspects of the brand owner's packaging which are points of similarity with the infringer's challenged packaging rather than enhancing recognition of the brand owner's packaging as a whole.

Had the District Court focused correctly on the KIND packaging as a whole, it almost certainly would have found that the packaging has acquired secondary meaning. The District Court acknowledged that secondary meaning may be demonstrated through evidence on (1) advertising expenditures, (2) unsolicited media coverage of the product, (3) sales success, (4) attempts to plagiarize the trade dress, and (5) length and exclusivity of the trade dress' use. SPA 7 (citing *L. & J.G. Stickley, Inc. v. Canal Dover Furniture, Co.*, 79 F.3d 258, 263 (2d Cir. 1996)). The evidence on these factors was overwhelming and largely undisputed. For example, the District Court acknowledged that KIND offered evidence that it

29

has spent more than $100 million on marketing and advertising, sold $600 million dollars' worth of KIND bars, and received extensive unsolicited media coverage. SPA 8.  The District Court also explicitly found that "Clif Bar's internal documents during the MOJO redesign period [indicate] that Clif Bar deliberately copied elements of the KIND trade dress for its new MOJO trade dress."  *Id.* at 7; *see Harlequin Enterps., Ltd. v. Gulf & W. Corp.*, 644 F.2d 946, 950 (2d Cir. 1981) ("Perhaps the most significant evidence of secondary meaning in this case, however, was the attempt by Simon & Schuster to capitalize on the Harlequin Presents cover when it introduced its own romance series.").

But the District Court disregarded KIND's secondary meaning evidence based on its erroneous view that the proper focus of inquiry should be only the points of similarity between the parties' respective trade dresses rather than the plaintiff's packaging as a whole.  SPA 8.  The District Court, in effect, improperly conflated the question of the protectability of KIND's trade dress with the question of likelihood of confusion.  Under a proper analysis, these are two distinct questions:  first, the District Court should have determined whether the KIND packaging, as a whole, is protectable as a trade dress, and second, the District Court should then have determined whether in light of similarities between the trade dresses, among other *Polaroid* factors, there is a likelihood that consumers will confuse the MOJO packaging with the KIND packaging.  *See Paddington*, 996

30

F.2d at 582, 584 (addressing distinctiveness first and likelihood of confusion separately).

The District Court's failure to assess secondary meaning in the trade dress KIND asserted—its entire snack bar wrapper—and its erroneous decision to disregard any of the evidence relevant to assessing secondary meaning in that trade dress, were legal errors and were fatal to its secondary meaning analysis.

## III.  Errors of Law In The District Court's Analysis Of The Likelihood of Confusion Also Require Remand.

Although likelihood of confusion is a heavily fact-based, multi-factor inquiry, and findings of fact are subject to a deferential standard of review on appeal, in this case, legal errors tainted the District Court's assessment of three of the most significant factors: strength of the plaintiff's trade dress, similarity of the parties' respective trade dresses, and survey evidence of actual confusion. Vacatur and remand for the Court to consider the evidence in light of the correct legal principles is appropriate.

### A.    The Foregoing Errors Tainted The District Court's Analysis Of the Strength Of KIND's Trade Dress.

The District Court's assessment of the strength of KIND's trade dress was *expressly* premised on its flawed distinctiveness and secondary meaning analyses. SPA 10 (holding that findings on secondary meaning and distinctiveness "weigh[] in [favor of] finding that the trade dress is weak").

In addition, when considering the evidence of strength of the KIND trade dress in commercial context, the District Court again focused on an abstraction comprised of six elements. *Id.* at 10–11. And, again erroneously relying on product configuration cases, the District Court expressly refused to consider the strength of the packaging as a whole, as it actually exists in the world. *Id.* at 11 (holding that KIND "has too broadly defined its trade dress" by seeking to protect the packaging as a whole, and citing as support *Landscape Forms*, 113 F.3d at 381 and *Jeffrey Milstein*, 58 F.3d at 32).

Remand is appropriate for the District Court to consider the strength of the actual KIND trade dress (the whole wrapper), not just an abstraction comprised of six elements, in light of a correct legal approach to assessing distinctiveness and secondary meaning.

### B.    The District Court Relied On A Misapplication Of Second Circuit Precedent In Its Similarity Analysis.

The District Court based its finding that the KIND and MOJO trade dresses are dissimilar in part on "the prominent use of the MOJO mark and the use of the Clif Bar mark" on the MOJO packaging. SPA 14. Relying on this Court's holding in *Bristol-Myers*, 973 F.2d 1033, the District Court reasoned that those markings tend to dispel any confusion as to the origin or sponsorship of the product. SPA 12, 14–15 & n.6.

But it was error to apply that principle from *Bristol-Myers* here.  In this case, it was undisputed that the KIND and MOJO trade names are ***not*** well known.  JA 970–71 (5/6 Tr. 480:21–481:1; 481:14–481:20), 1096.  As to the CLIF trade name (the only arguably well-known name), the evidence was undisputed that it is not displayed prominently on the MOJO bar wrapper, SPA 15 n.6 ("KIND is correct that the Clif mark is not the most prominent feature of the MOJO trade dress . . . ."); JA 775, and, indeed, is not even visible when the MOJO products are displayed in "caddies," which is one of the most common ways in which these products appear in stores.  JA 615 (5/6 Tr. 345:19–21).

This Court expressly limited the reach of *Bristol-Myers* to cases involving the prominent display of well-known trade names.  The trade dress dispute at issue in *Bristol-Myers* involved the trade dress of two ubiquitous brands, EXEDRIN and TYLENOL.  Both brand names were "by far the most prominent feature" of their respective packages—indeed, each brand was "emblazoned over almost half" its package.  *Bristol-Myers*, 973 F.2d at 1046–47.  This Court expressly cautioned that the reach of its holding was limited:

> We do not mean to intimate that the distinctive elements of any trade dress may be freely appropriated as long as the junior user clearly identifies the source of the goods. In many cases . . . the trade name may be a less dominant feature of the entire trade dress and thus have less force in countering other similarities between two trade dresses. Also, the junior user's trade name may less

> strongly identify a particular source than the 'Tylenol'
> name at issue here.

*Id.* at 1047.  This Court thereafter refused to apply *Bristol-Myers* to a case

involving less well known brands.  *Fun-Damental Too*, 111 F.3d at 1003

("Defendants rely on [*Bristol-Myers*] for the proposition that a prominently

displayed trade name on a product's packaging eliminates the possibility of

confusion based on similarity of trade dress. . . .  However, the instant case

involves trade names much less recognized than 'Tylenol' and 'Exedrin,' at issue

in *Bristol-Myers* . . . .").

The district courts have only inconsistently heeded this Circuit's warning.

Although most courts have recognized that *Bristol-Myers* is not appropriately

applied to brand names that are not well known or prominently displayed, some

courts have expanded *Bristol-Myers* beyond its intended reach.  *Compare McNeil-*

*PPC, Inc. v. Merisant Co.*, Civ. No. 04-1090 (JAG), 2004 WL 3316380, at *17

(D.P.R. July 29, 2004) (refusing to apply *Bristol-Myers* where the junior mark did

not "have the same level of recognition as [the] famous Tylenol mark"), *Fruit-Ices*

*Corp. v. Coolbrands Int'l Inc.*, 335 F. Supp. 2d 412, 425–26 (S.D.N.Y. 2004)

(finding reliance on *Bristol-Myers* "misplaced" where less well-known brand

names at issue), *and Funrise Canada (HK) Ltd. v. Zauder Bros., Inc.*, No. 99-CV-

1519 (ARR), 1999 WL 1021810, at *20 (E.D.N.Y. July 2, 1999) (finding the

impact of brand names in dispelling confusion "substantially reduced where the

markings are not widely recognized"), *with* SPA 15 n.6, *and Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 249 (S.D.N.Y. 1999) (applying *Bristol-Myers* to ETERNITY and ROMANCE perfume trade dresses with no discussion of whether those marks are well-known).

The District Court considered and rejected KIND's argument that application of *Bristol-Myers* to this case would be misplaced.  SPA 15 n.6.  Specifically, the District Court held that subsequent case law demonstrates that *Bristol-Myers* need not be limited to situations involving well known trade names. *Id.*  But the District Court's reading of the cases on which it relied for that holding is inaccurate:  The cases do not support the proposition for which the District Court cited them.  In *Nora Beverages, Inc. v. Perrier Grp. of America*, this Court did not "apply[] *Bristol Myers*" to the facts of the case, as the District Court stated, *see* SPA 15 n.6, but rather merely instructed the court below to "consider" on remand whether *Bristol-Myers* should apply to the water bottles at issue.  164 F.3d at 746 n.11.  In *Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, far from applying *Bristol-Myers* to the facts of the case, as the District Court would have it, the court in that case expressly held that *Bristol-Myers* should ***not*** apply.  90 F. Supp. 2d 431, 456 (S.D.N.Y. 2000).  The only case cited by the District Court to support its holding which actually did apply *Bristol-Myers* failed to address whether the trade names at issue were well-known or not.  *See Conopco*, 49 F. Supp. 2d at 249

(applying *Bristol-Myers* to ETERNITY and ROMANCE perfume trade dresses with no discussion of whether those marks are well-known).

### C.    The District Court Improperly Discounted KIND's Survey Evidence.

In assessing KIND's survey evidence of likely confusion, the District Court failed to identify—much less address—the ***legal issue*** which both sides' experts agreed was at the heart of the difference between them.  Instead, the District Court discounted KIND's survey evidence based on evidence which both sides' experts agreed was not relevant to assessing the survey data.

### 1.    KIND's Survey Evidence

KIND's survey expert, George Mantis, conducted a survey following a methodology accepted as valid and probative by courts in the Southern District on several occasions.  JA 236–37 ¶ 6.  *See, e.g., EnergyBrands Inc. v. Beverage Mktg. USA, Inc.*, No. 02 Civ. 3227 (JSR), 2002 WL 826814, at *2 (S.D.N.Y. May 1, 2002); *Kraft General Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 130–31 (S.D.N.Y. 1993) (describing the methodology); *Kraft General Foods, Inc. v. Friendship Dairies, Inc.*, No. 91 Civ. 2276 (KC), 1991 WL 149755, at *4 (S.D.N.Y. June 26, 1991).

In Mr. Mantis' survey, 26% of relevant consumers shown the redesigned MOJO packaging challenged in this lawsuit (the "New MOJO Trade Dress") expressed the mistaken belief that it is made by or affiliated with KIND.  JA 240–

41 ¶ 15.  This was a measure of "gross confusion."  But, more important than this "gross" confusion level, Mr. Mantis used a control to isolate the "net" level of confusion ***caused specifically by the New MOJO Trade Dress***.  Another group of relevant consumers were shown a "control" stimulus instead of the New MOJO Trade Dress.  As his control, Mr. Mantis used a prior iteration of the MOJO trade dress ("Prior MOJO Trade Dress").  Mr. Mantis' control held constant all variables other than the trade dress at issue:  It was the same type of product (a "fruit and nut bar"), it bore the CLIF and MOJO names, and it did not share any of the design elements which KIND alleges contribute to an infringing overall impression.  JA 168 (4/28 Tr. 164:1–164:15), 238–39 ¶¶ 10–11, 354–55 ¶ 2.  By subtracting the 11% confusion among respondents shown the control from the 26% confusion among respondents shown the New MOJO Trade Dress at issue, Mr. Mantis was able to conclude with a high degree of scientific confidence that the remaining confusion—15%—is caused specifically by the New MOJO Trade Dress.  JA 177–78 (4/28 Tr. 173:20–174:2), 241 ¶¶ 16–19.

## 2.    Clif's Unavailing Critique Of KIND's Survey Evidence

Clif's survey expert, Dr. Michael Rappeport, agreed that Mr. Mantis' survey methodology was generally appropriate and did not dispute the 26% gross confusion figure reported by Mr. Mantis.  JA 577.  Dr. Rappeport agreed that Mr. Mantis' survey was properly designed and conducted, with a single "major"

exception.  JA 512 (4/30 Tr. 311:10–18, 236:10–16), 577.  Dr. Rappeport's only material criticism of the Mantis survey was in Mantis' selection of a control stimulus.  Dr. Rappeport contended that a proper control stimulus should have included a see-through element.  JA 578.

Dr. Rappeport was instructed by Clif's counsel to assume that transparency is a "generic" element in snack bar packaging.  JA 498 (4/30 Tr. 297:5–297:14); JA 578].  Based on this assumption provided by counsel, Dr. Rappeport concluded that any confusion caused primarily by the transparent element should be controlled for and that a proper control should therefore include a transparent element.  JA 462 (4/30 Tr. 229:7–25), 473 (4/30 Tr. 240:6–11), 577–79.  Dr. Rappeport expressly acknowledged that if the assumption provided by counsel—that the transparent element is "generic"—is wrong, then his critique of Mr. Mantis "[w]ould change radically."  JA 499 (4/30 Tr. 298:10–24).

The assumption provided by counsel underlying Dr. Rappeport's critique is wrong; but the District Court never addressed the issue.  "A generic term [or element] is one that refers, or has come to be understood as referring, to the genus of which the particular product is a species. . . .  [One] cannot deprive competing manufacturers of the product of the right to call an article by its name."  *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976); *cf. Mana Prods. v. Columbia Cosmetics Mfg.*, 65 F.3d 1063, 1070 (2d Cir. 1995) ("As

a whole, the compacts' size and shape—with their rectangular and square designs—are common characteristics of the entire genre of makeup compacts."). Clif failed to demonstrate that a transparent element in snack bar packaging meets the definition of "generic." The closest "fruit & nut" bar competitor for both the KIND and MOJO products is the LÄRABAR product, which uses no transparent packaging elements, yet still manages to communicate that it is within the genus of fruit & nut bars. JA 225 ¶ 13. In the Nutritional Snack Bar category, none of the top 16 brands (together accounting for about 75% of the market) use a transparent element except for KIND and MOJO (and MOJO originally did not). JA 224–25 ¶ 12; JA 47–48 (4/28 Tr. 44:22–45:19). Clif itself has been packaging its market-leading CLIF BAR product, its LUNA product, and its CLIF BUILDERS product for years without ever using a transparent element, and earlier generations of the MOJO packaging were likewise entirely opaque. JA 204–05 ¶ 5, 223 ¶ 11.

Clif apparently scoured the market for as many products using clear packaging as it could find, and was able to identify in its brief just 26 out of hundreds and hundreds of brands—26 brands that together amount to less than one percent of the market. JA 59 (4/28 Tr. 56:14–20), 61 (4/28 Tr. 58:1–5), 363. Along with the failure to even acknowledge the LÄRABAR package, the small number of niche products collected by Clif underscores that Clif cannot support its assumption that a transparent packaging element is legally generic for food bars,

snack bars, fruit & nut bars, or any other cognizable genus to which KIND bars might belong.

KIND agrees that transparency serves a function in snack bar packaging. But to the extent confusion is driven primarily by a functional element in combination and arrangement with other elements in an overall packaging design, that is not confusion which should be controlled for because the law is clear that functional elements are properly protected as part of the unique configuration of elements that make up an overall, distinctive impression. *See Paddington*, 996 F.2d at 584 ("[I]t is the ***combination*** of elements and the total impression that the dress gives to the observer that should be the focus of a court's analysis . . . ."); *Cartier, Inc.*, 294 F. App'x at 620–21 ("[I]t [i]s improper for defendants to break the trade dress down into specific elements and call them functional, because plaintiffs' claim is that the combination and arrangement of those design elements comprise the trade dress at issue."); *see also LeSportsac, Inc.*, 754 F.2d at 76 (same).  In fact, in the *Fun-Damental Too* case, this Court considered a trade dress which contained a transparent element.  This Court held that the trade dress was protectable, even though the transparent element (along with other elements) served a function, because the trade dress taken as a whole was distinctive. 111 F.3d at 1002.

Given that any confusion caused by the transparent element of the MOJO trade dress in combination is actionable, it would be inappropriate as a matter of binding precedent to include that element in a control as Dr. Rappeport criticized Mr. Mantis for failing to do.  The transparent element (though functional) is a part of the legally-protected trade dress, and if the commercial impression created by all the elements combined—including the transparent element—is leading to confusion, such confusion should be counted.  Mr. Mantis was right, as a matter law, to use a control which removed *all* the elements comprising the allegedly infringing design, including the transparent element.  Finally, Dr. Rappeport acknowledged that Mr. Mantis's control allowed the District Court to determine whether "all the elements combined are causing the confusion," SPA 17 (citing JA 460 (4/30 Tr. 227:7-21)).  This was the relevant question under the law of this Circuit.

### 3.    The Court's Flawed Analysis

The District Court's analysis of the survey evidence did not even acknowledge the sole area of disagreement between the parties' respective experts. Although the District Court credited Dr. Rappeport's view that the Mantis survey did not adequately show what caused the confusion, *see* SPA 17, it is evident from the District Court's opinion that the District Court failed to recognize, much less analyze, the basis for Dr. Rappeport's view.

As noted in the preceding Section, the sole material area of difference between Mr. Mantis and Dr. Rappeport was their respective views on whether or not a control should include a transparent element.  As also noted above, Dr. Rappeport acknowledged that this is a ***legal question*** and that his critique of Mr. Mantis would evaporate if the legal question were resolved against the proposition of law he was asked to assume.  The District Court, however, did not address the legal question.  The District Court did not even acknowledge the fact that Mr. Mantis' survey used a control, much less discuss whether the control was appropriate under the law (the key question in dispute).  From the District Court's opinion, it is not even apparent that the District Court appreciated that a control was used at all.

Instead, the District Court's holding that the Mantis survey failed to demonstrate causation was based on the District Court's *sua sponte* review of verbatim responses to the open-ended questions at the end of the Mantis survey, in which survey respondents were asked "why do you say that" with regard to their earlier answers.  SPA 17 n.8.  The District Court's reliance on its *sua sponte* review of verbatim responses to support a finding that Mr. Mantis' data failed to demonstrate causation was clearly erroneous in light of the facts that (1) Mr. Mantis testified expressly that he did not rely on verbatim responses to demonstrate causation, JA 184 (4/28 Tr. 180:12–18), 360 ¶ 12; (2) both experts

agreed that the verbatim responses did not provide useful information on causation, JA 184 (4/28 Tr. 180:7–11), 511 (4/30 Tr. 310:16–24), 577; and (3) both experts agreed that the valid way to demonstrate causation is through use of a properly chosen control.  JA 167 (4/28 Tr. 163:2–163:9), 465 (4/30 Tr. 232:7–15), 582.

The clearest evidence that the District Court did not understand the survey methodology in general, and the purpose of a control specifically, was that, in conducting its *sua sponte* review of verbatim responses, the District Court quoted verbatim responses from both the test cell and the control cell without distinguishing between the two.  *Compare* SPA 17 n.8, *with* JA 332–33 (criticizing answers from Respondents 2,959,724 and 10,955,032 because they referenced "irrelevant considerations," but failing to recognize that those irrelevant responses were responses to the control stimulus rather than the New MOJO Trade Dress).  Every response in a proper control cell, by definition, reflects a response that is "irrelevant" and should be discounted.  That is precisely why Mr. Mantis collected the data in the control cell and used it to discount the results in the test cell.  This distinction eluded the District Court.

The experts differed as to whether Mr. Mantis had chosen a legally proper control.  But that difference—the heart of the dispute—is one the District Court failed even to recognize, much less analyze.

## IV. The Foregoing Errors Fatally Tainted The District Court's Analysis Of Irreparable Harm, The Balance Of Hardships And The Public Interest.

The District Court explicitly incorporated its erroneous likelihood of confusion analysis as the basis of its conclusions concerning irreparable harm, the balance of hardships, and the public interest.  *See* SPA 23 ("In light of the Court's finding that KIND has failed to establish likelihood of confusion, KIND's claim of potential lost goodwill and market share resulting from consumer confusion also fails."); *id.* at 25 ("As already discussed above, [KIND's argument that the balance of hardships favors injunctive relief] fails in light of the Court's finding that KIND has not established a likelihood of consumer confusion.");[3] *id.* ("In light of the Court's finding that KIND has failed to establish likelihood of consumer confusion, the Court finds that the public interest would not be served by issuing a

---

[3]   It should also be noted that, in assessing the balance of hardships, the Court relied primarily on evidence of calculable, compensable harms alleged by Clif as likely to result in the event an injunction was found to have been granted in error after trial.  *See* SPA 25 ("[E]ven if KIND is correct that Clif Bar's [readily calculated] losses are not as high as it projects and that Clif Bar could redesign its trade dress in three months [eliminating alleged reputational harms in light of the transition period incorporated in KIND's requested order], the balance of hardships still tips in Clif Bar's favor.").  This was not the relevant comparison for purposes of balancing hardships.  *See Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) ("[I]nterests are relevant [in balancing hardships] only to the extent that they are not remediable after a final adjudication."); *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 8 (2d Cir. 1996) ("Turning to the balance of hardships, the only harm to Quality King from the full preliminary injunction is the loss of profits on sales. This amount is quantifiable, and Warner-Lambert can compensate Quality King for that loss after trial if the injunction is found to have been granted in error.").

preliminary injunction in this case.").  As demonstrated in Section III, above, the District Court's likelihood of confusion analysis was, in turn, fatally tainted by the District Court's legally erroneous analysis of distinctiveness and secondary meaning (in addition to other errors).

Given the legal errors permeating the analysis explicitly underlying the District Court's conclusions as to irreparable harm, balance of hardships, and the public interest, vacatur and remand so that each of these issues can be considered in light of correct legal principles is appropriate.

## <u>CONCLUSION</u>

For all the foregoing reasons, KIND respectfully requests that this Court vacate the District Court's Opinion & Order and remand the case to the District Court to consider the evidence in light of the correct legal principles.

As noted above, the importance of this matter to the KIND brand goes beyond the irreparable harm caused by continued sales of MOJO bars in their current packaging.  The District Court's holding that the KIND trade dress is not protectable leaves KIND vulnerable to blatant copycats.  This is an existential threat to the KIND brand.  Accordingly, KIND urgently seeks this Court's review and correction of the District Court's flawed analysis of inherent distinctiveness and secondary meaning.


Dated: New York, New York
        August 28, 2014                    Respectfully submitted,

                              By:    <u>/s/ *David H. Bernstein*</u>
                                     DEBEVOISE & PLIMPTON LLP
                                     David H. Bernstein
                                     Jyotin Hamid
                                     Charles W. Baxter
                                     Danielle E. Kasten
                                     919 Third Avenue
                                     New York, NY 10022
                                     Tel: (212) 909-6696
                                     Fax: (212) 909-6836

                                     *Attorneys for Plaintiff–Appellant*

## CERTIFICATE OF COMPLIANCE
## <u>PURSUANT TO FED. R. APP. P. 32(a)(7)(C)</u>

I certify that the foregoing Brief complies with the type-volume limitation of

Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,774 words,

excluding the parts of the brief exempted by Federal Rule of Appellate Procedure

32(a)(7)(B)(iii).

I certify that the foregoing Brief complies with the typeface and type style

requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it

has been prepared in a proportionally spaced typeface using Microsoft Word 2010

in 14-point font of Times New Roman type style.


Dated:        August 28, 2014        By:    /s/ *David H. Bernstein*
                                              David H. Bernstein

# Special Appendix

**i**

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

                                                                    **Page**

Opinion and Order of the Honorable Kimba M.
    Wood, dated June 12, 2014, Appealed From ......... SPA-1

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
KIND LLC,                                   :
                                            :
                          Plaintiff,        :              14 Civ. 770 (KMW) (RLE)
                                            :              <u>OPINION & ORDER</u>
            -against-                       :
                                            :
CLIF BAR & COMPANY,                         :
                          Defendant.        :
-----------------------------------------------------X

KIMBA M. WOOD, U.S.D.J.:

        Plaintiff KIND LLC ("Plaintiff" or "KIND") has moved pursuant to Rule 65 of the

Federal Rules of Civil Procedure for a preliminary injunction against Defendant Clif Bar &

Company ("Defendant" or "Clif Bar").  KIND seeks to prevent Clif Bar from using a new trade

dress for its MOJO bars that KIND alleges infringes upon the distinctive trade dress of KIND

bars.  For the reasons set forth below, the Court DENIES Plaintiff's motion.

        **I.      Background**

        Both KIND, founded in 2004, and Clif Bar, found in 1992, produce healthy snack bars.

(Lubetzky Decl. ¶ 2, 3 [Dkt. No. 11]); (Cleary Decl. ¶¶ 2, 15 [Dkt. No. 32]).  KIND sells KIND

bars, (Lubetzky ¶ 2), while Clif Bar sells an array of different bars, including the Clif MOJO bar,

at issue here, (Cleary Decl. ¶ 2).  KIND argues that Clif Bar's new trade dress for its MOJO bar

mimics several key elements of the KIND trade dress, which it defines as:

                    (1) packaging with a transparent, rectangular front panel revealing a
                    large portion of the bar itself; (2) a horizontal stripe bisecting the
                    transparent front panel containing the flavor of the bar in text; (3) a
                    text description of the product line (e.g. "Fruit & Nut," "Plus," or
                    "Nuts & Spices") in line with the horizontal stripe bisecting the
                    transparent front panel; (4) a vertical black band, offset to the side
                    of the package, containing a bulleted list of many of the bar's key
                    healthful attributes; (5) opaque vertical bands, or end caps, at either
                    edge of the product package; and (6) a 40g size, in a slender shape.

1

(Lubetzky Decl. ¶ 20); (Mem. of Law in Supp. 2–3 [Dkt. No. 9]).[1]

## II.    Discussion

"The District Court may grant a preliminary injunction if the moving party establishes (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012) (internal quotation marks omitted).  In addition, the "court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor" and "the court must ensure that the public interest would not be disserved by the issuance of a preliminary injunction."  *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (internal quotation marks omitted).

The Court finds that Plaintiff has failed to establish a likelihood of success on the merits, or irreparable harm, or that the balance of hardships tips decidedly in its favor.  The Court therefore DENIES Plaintiff's motion.

---

[1] In its post-hearing reply papers, KIND writes that "[a]lthough KIND pointed out the six specific elements that directly contribute to the overall infringing impression created by the MOJO wrapper, it has consistently argued that it is ultimately the ***overall*** impression of the packaging, rather than the individual elements, that is at issue." (Post-Hrg. Reply Mem. of Law 2 [Dkt. No. 73]).  To the extent that KIND seeks to protect something more than the six elements it has articulated as its trade dress, the Court rejects KIND's attempt.  As explained by the Second Circuit:

> [F]ocus on the overall look of a product does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress. Without such a precise expression of the character and scope of the claimed trade dress, litigation will be difficult, as courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market. Courts will also be unable to shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves protection. Moreover, a plaintiff's inability to explain to a court exactly which aspects of its product design(s) merit protection may indicate that its claim is pitched at an improper level of generality, i.e., the claimant seeks protection for an unprotectable style, theme or idea.

*Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997)

A. *Likelihood of Success on the Merits*

A product's trade dress is protected by section 43(a) of the Lanham Act, which provides a cause of action against any person who "in connection with any goods . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval of his or her goods . . . by another person." 15 U.S.C. § 1125(a). A trade dress that is functional is not protected by the Lanham Act. *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 743 (2d Cir. 1998).

In order to succeed on a trade dress infringement claim, the plaintiff must show that (1) its trade dress is protectable due to the dress's (a) inherent distinctiveness or (b) acquisition of secondary meaning, and (2) likelihood of consumer confusion. *Id.* The Court finds that Plaintiff has failed to meet either test.

1. Inherent Distinctiveness or Secondary Meaning

i. **Distinctiveness**

A product's distinctiveness is evaluated using the test set out by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9–10 (2d Cir. 1976). *See Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 583 (2d Cir. 1993) (adopting *Abercrombie* test to evaluate distinctiveness of a product's trade dress). Under this test, a trade dress is classified, in ascending order of strength, as (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful. *Id.* A generic trade dress is never protectable. *Id.* A descriptive trade dress is protectable if the plaintiff establishes that it has acquired secondary meaning. *Id.* A suggestive or arbitrary or fanciful trade dress is always inherently distinctive. *Id.* "The Supreme Court has emphasized that an inherently distinctive trade dress is one whose

3

intrinsic nature serves to identify a particular source of a product, although it may not yet have widespread identification among consumers." *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1000 (2d Cir. 1997) (internal citation and quotation marks omitted).

"Although each element of a trade dress individually might not be inherently distinctive, it is the combination of elements that should be the focus of the distinctiveness inquiry." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995). However, "the fact that a trade dress is composed exclusively of commonly used or functional elements might suggest that that dress should be regarded as unprotectable . . . to avoid tying up a product or marketing idea." *Id.* The Second Circuit has cautioned that in evaluating a trade dress' distinctiveness, courts should bear in mind two considerations: First, "overextension of trade dress protection can undermine restrictions in copyright and patent law that are designed to avoid monopolization of products and ideas." *Id.* Second, "just as copyright law does not protect ideas but only their concrete expression, neither does trade dress law protect an idea, a concept, or a generalized type of appearance." *Id.*

KIND argues that its trade dress is distinctive because the trade dress is "unique, arbitrary, and inherently distinctive." (Mem. of Law in Supp. 7). KIND relies on Second Circuit case law stating that, "the varieties of labels and packaging available to wholesalers and manufacturers are virtually unlimited. As a consequence, a product's trade dress typically will be arbitrary or fanciful and meet the inherently distinctive requirement for § 43(a) protection." *Fun-Damental Too, Ltd.*, 111 F.3d at 1000. Clif Bar argues that KIND's trade dress is generic. (Mem. of Law in Opp. 11 [Dkt. No. 31]). The Court disagrees with both parties.

The Court finds that "despite the tendency for trade dresses to be inherently distinctive because the whole universe of materials and designs is available for packaging," Plaintiff's very

common packaging design is not inherently distinctive. *Regal Jewelry Co., Inc. v. Kingsbridge Int'l, Inc.*, 999 F. Supp. 477, 489 (S.D.N.Y. 1998) (Newman, J.). Many food bars, in addition to KIND and MOJO bars, use one or more of the six elements that KIND seeks to protect here as its trade dress. *See* (DX 66 (food bars in transparent packaging)); (Grant Decl. ¶¶ 6, 8, 13, 17, 19, 20 (food bars using horizontal banners containing product and/or flavor descriptions), ¶¶ 8–9, 12, 14–17, 24, 29–31 (food bars declaring product attributes along one side of front panel); ¶¶ 6–8, 12, 15, 19–23, 25–27, 30 (food bars that are 40 grams in size) [Dkt. No. 34]); (Cleary Decl. ¶¶ 39–40 (use of transparent packaging in food industry in general and by other food bar packagers), ¶¶ 47–49 (use of opaque end caps in other Clif Bar products, common use of bullet points in consumer packaging, common practice of labeling products as "gluten free")); (Rosen Decl. ¶¶ 4–12 (use of transparent packaging in food industry in general and in Clif Bar products), ¶ 17 (use of transparent packaging by other manufacturers of food bars), ¶ 22 (use of opaque end caps in virtually all Clif Bar products and bars made by third-parties) [Dkt. No. 33]). Most of the six elements also serve functional purposes (e.g., the transparent window serves the purpose of revealing the bar within; the text description serves the purpose of informing the consumer of the bar's ingredients, etc.), which also militate against finding that the KIND trade dress is protectable. *Jeffrey Milstein, Inc.*, 58 F.3d at 32. Moreover, the six elements, either individually or together, do not serve to identify the source of the bar. *Fun-Damental Too, Ltd.,* 111 F.3d at 1000. Notably, the only element of KIND's packaging that indicates its source, the KIND logo, is not included in the trade dress KIND seeks to protect here.

The Court finds that KIND's packaging is also not generic. "An otherwise protectable trade dress can become generic within a particular market if the design becomes a standard or

5

custom for the industry." *Regal Jewelry Co., Inc.*, 999 F. Supp. at 489.  The Court does not

believe that the six elements combined have become "a singular custom in the industry."  *Id.*

The Court finds that KIND's trade dress is more appropriately deemed descriptive; the

elements KIND seeks to protect here all describe its product.  *See Med. Econ. Co., Inc. v.

Prescribing Reference, Inc.*, 294 F. Supp. 2d 456, 463 (S.D.N.Y. 2003) (Daniels, J.)

("Descriptive marks are marks that describe a product or its attributes.").  The most prominent

feature of the trade dress is the "transparent, rectangular front panel *revealing a large portion of

the bar itself*."  (Lubetzky Decl. ¶ 20 (emphasis added)).  Two other prominent elements that

describe the product are the "text description of the product line . . . in line with the horizontal

stripe bisecting the transparent front panel," (*id.*), and the "40g size, in a slender shape," (*id.*).

The other features of the trade dress also describe the product in some way.  The horizontal stripe

bisecting the transparent front panel "contain[s] the flavor of the bar in text."  (*Id.*).  The vertical

black band "contain[s] a bulleted list of many of the bar's key healthful attributes."  (*Id.*).  The

only element that might not seem descriptive at first are the opaque end caps; however, the Court

notes that the colors of KIND bars's opaque end caps sometimes reflect the flavor of the bar, or

feature plus signs to reflect the bar's status as part of KIND's "Plus" line.  *See, e.g.*, (DX 91-L

(blueberry vanilla & cashew KIND bar with blue end caps)); (DX 91-I (almond & apricot KIND

bar with apricot-colored end caps)); (DX 25-A (peanut butter & strawberry KIND bar with light-

brown colored end caps)); (DX 91-E–G (KIND "Plus" bars with end caps featuring plus signs)).[2]

ii.     **Secondary Meaning**

---

[2] KIND has secured two registrations with the United States Patent and Trade Office for its packaging, Reg.
Nos. 3,882,221 and 4,097,493.  KIND also argues that its trade dress is prima facie protectable as a consequence of
these registrations.  (Mem. of Law in Supp. 7–8 [Dkt. No. 9]).  This argument is unavailing.  The trade dress that
KIND seeks to protect here is different from the trade dress covered by its registrations.  For example, both
registrations include the word "KIND" and the four bars above it, but the trade dress KIND seeks to protect here
does not include either of those elements.

6

"When trade dress is descriptive, it must have obtained secondary meaning with consumers at the time of the alleged infringement in order to be protectable." *Regal Jewelry Co., Inc.*, 999 F. Supp. at 490 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992)). "The trade dress of a product attains secondary meaning when the purchasing public 'associates' its design with a single producer or source rather than simply with the product itself." *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 168 (2d Cir. 1991). "[P]roof of secondary meaning entails vigorous evidentiary requirements." *Id.* at 169. "[A] party seeking to prove secondary meaning has a heavy burden . . . ." *20th Century Wear, Inc. v. Sanmark-Stardust, Inc.*, 815 F.2d 8, 10 (2d Cir. 1987) (internal quotation marks omitted). Factors that are relevant in determining secondary meaning include "(1) advertising expenditures, (2) consumer studies linking the dress to the source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the dress, and (6) length and exclusivity of the [dress]'s use." *L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co., Inc.*, 79 F.3d 258, 263 (2d Cir. 1996) (internal quotation marks omitted). No single factor is determinative and not all factors need to be proven. *Id.* The Court finds that KIND has failed to meet its heavy burden of establishing that its trade dress has acquired secondary meaning.

It appears from Clif Bar's internal documents during the MOJO redesign period that Clif Bar deliberately copied elements of the KIND trade dress for its new MOJO trade dress and therefore the "attempts to plagiarize the dress" factor weighs in favor of KIND. *See, e.g.*, (Baxter Decl. Ex. A (email recapping a MOJO redesign meeting stating that, "[e]veryone also agreed that Kind is a best in class packaging that we should learn from for MOJO" and listing the following "learnings": (1) "[l]arge product visual with clear window"; (2) "[g]ood branding (KIND);" (3) "[c]laims on front panel (not wrapped); and (4) "[g]ood flavor communication

7

claim"); Ex. B (internal Clif Bar PowerPoint finding that KIND has an "advantage" in packaging

because of its "large clear window" and because its "claims are clearly indicated on the front

wrapper"); Ex. C (email instructing a team member to "[b]ring multiple KIND bars" to a MOJO

redesign meeting); Ex. E (Mojo 2013 Refresh Packaging Brief listing as "[c]onsiderations" that

packaging should "[i]nclude a large clear window so that ingredients can be visible" and

"[c]laims . . . should be on the front of the wrapper"); Ex. F (excerpt from a PowerPoint

presentation titled "Mojo Packaging Refresh," listing as a "packaging objective[]" to "[c]ompete

head-to-head with Kind" by incorporating a "[l]arger window to showcase bar with whole pieces

of fruits & nuts" and "[s]imilar window shape & coloring to Kind"); Ex. G (email from Kim

Dao, Brand Manager, with the subject "Mojo Creative Weekly 7/9 RECAP," stating that the

MOJO packaging is "now too close to KIND") [Dkt. No. 45]).[3]

       KIND argues that the following factors also weigh in favor of finding that its trade dress

has acquired secondary meaning: since the product's launch, KIND (1) has spent more than $100

million on marketing and advertising, (Lubetzky ¶ 13); (2) has sold $600 million dollars' worth

of KIND bars, (*id.* ¶ 16); (3) has received extensive unsolicited media coverage, (*id.* ¶ 17); and

(4) all KIND bars have shared the six elements KIND seeks to protect here, (*id.* ¶ 3).  However,

KIND fails to establish that its sales, marketing and advertising expenditures, and unsolicited

media coverage have resulted in consumers associating the six elements it seeks to protect as its

trade dress with KIND.  *Cf. Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d at 168.

The trade dress KIND seeks to protect here excludes its logo, and KIND has not shown that its

packaging, without the logo, has acquired secondary meaning.  The Court notes that even the

four advertisements KIND submitted that featured KIND bars without the KIND logo, PX 200–

---

[3] The Court recognizes, however, that some of the elements that Clif Bar identified as KIND's trade dress are not part of the trade dress KIND seeks to protect here (e.g., the "[g]ood branding (KIND)").

03, displayed the KIND logo elsewhere on the advertisement. *Cf. Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 249 (S.D.N.Y. 1999) (Sprizzo, J.) (finding that perfume bottle had not acquired secondary meaning partly because there was no evidence of "what percentage of magazine ads contained the . . . perfume bottle or what percentage of television or black and white ads contained the perfume bottle"). As a result, it is impossible for the Court to determine whether secondary meaning has been acquired by (i) the six elements KIND seeks to protect here as its trade dress, or (ii) KIND's trademarked logo, or (iii) the combination of the logo and the six elements.

Although "intentional copying constitutes persuasive evidence of consumer recognition, conscious replication alone does not establish secondary meaning." *Coach Leatherware Co., Inc. v. AnnTaylor, Inc*., 933 F.2d at 169 (internal citation omitted). The Court finds that KIND has failed to establish that its trade dress has acquired secondary meaning.

### 2. Likelihood of Consumer Confusion

In determining the likelihood of consumer confusion, district courts examine the eight factors in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961), which are: "(1) the strength of the plaintiff's trade dress, (2) the similarity between the two trade dress, (3) the proximity of the products in the marketplace, (4) the likelihood that the prior owner will bridge the gap between the products, (5) evidence of actual confusion, (6) the defendant's bad faith, (7) the quality of defendant's product, and (8) the sophistication of the relevant consumer group." *Fun-Damental Too, Ltd.*, 111 F.3d at 1002–03. No single factor is dispositive and the factors are not exclusive. *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998). Based on the evidence presented, the Court finds that most of the *Polaroid* factors and additional marketplace factors weigh in favor of Defendant.

9

i.  **Strength**

The strength of a trade dress is its "tendency . . . to identify the goods sold as emanating from a particular source, even when the source is unknown to the consumer." *Fun-Damental Too, Ltd.*, 111 F.3d at 1003 (internal quotation marks omitted).  This analysis turns on a number of factors, including the classification of the trade dress on the *Abercrombie* spectrum and the existence of secondary meaning; however, "the essence of the analysis is to determine the strength of the trade dress in its commercial context." *Id.*  "Even an inherently distinctive [trade dress] can, in its commercial context, lack strength as a [trade dress]." *Nora Beverages, Inc.*, 269 F.3d at 123.  "The use of part or all of the [trade dress] by third parties weakens its overall strength." *Time, Inc. v. Petersen Pub. Co. L.L.C.*, 173 F.3d 113, 118 (2d Cir. 1999).  For the reasons stated below, the Court finds that the KIND trade dress is weak.  This factor weighs in favor of Defendant.

a.  Abercrombie *Spectrum and Secondary Meaning*

As discussed above, KIND's trade dress is descriptive and has not acquired secondary meaning.  Therefore the trade dress is not inherently distinctive.  This weighs in finding that the trade dress is weak.

b.  *Commercial Context*

As described above, many food bars use the elements KIND seeks to protect as its trade dress, either individually or by using some elements in combination.  This also undercuts the strength of the KIND trade dress.  *See Time, Inc. v. Petersen Pub. Co. L.L.C.*, 173 F.3d at 118; *see also P.F. Cosmetique, S.A. v. Minnetonka Inc.*, 605 F. Supp. 662, 668 (S.D.N.Y. 1985) (Leisure, J.) (concluding that a trade dress was "weak" because "its main features are used by a not inconsiderable number of other companies for other products").

SPA-11

That many products share some of the elements KIND seeks to protect here as its trade

dress also "indicate[s] that its claim is pitched at an improper level of generality." *Landscape*

*Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997).  KIND has too broadly

defined its trade dress, making it difficult for the Court and other bar manufacturers to determine

what KIND seeks to protect and what KIND believes infringes.  For example, Mr. Lubetzky,

KIND's CEO, testified that the Think Thin Crunch bar "may arguably be infringing" as well,

(Lubetzky Reply Decl. ¶ 16 [Dkt. No. 41]), but most of the six elements KIND seeks to protect

here as its trade dress do not appear on the trade dress of the Think Thin Crunch bar, (DX 52-F–

J).[4]  The only similarities between the trade dress of the Think Thin Crunch bar and the trade

dress that KIND seeks to protect here are the transparent window and the opaque end caps.  It

appears then that KIND impermissibly seeks protection for "a generalized type of appearance."

*Jeffrey Milstein, Inc.*, 58 F.3d at 32.  Allowing KIND to protect an overly broad trade dress

would go against the Second Circuit's admonition that courts should be careful not to overextend

trade dress law and that trade dress law does not "protect an idea, a concept, or a generalized

type of appearance."  *Id.*

Based on the above, the Court finds that the KIND trade dress is weak.  The trade dress,

taken as a whole and in its commercial context, does not indicate the source of the product.  This

factor weighs in favor of Defendant.

ii.    **Similarity**

---

[4] The trade dress of the Think Thin Crunch bar does not have "a horizontal stripe bisecting the transparent front panel containing the flavor of the bar in text," "a text description of the product line (e.g. 'Fruit & Nut,' 'Plus,' or 'Nuts & Spices') in line with the horizontal stripe bisecting the transparent front panel," or "a vertical black band, offset to the side of the package, containing a bulleted list of many of the bar's key healthful attributes."  It arguably does not even have "a 40g size, in a slender shape," because although the bar weighs 40 grams, it is not slender.

11

In evaluating similarity, the Court must consider whether the two products "create the same general overall impression." *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir. 1979). "The presence and prominence of markings tending to dispel confusion as to the origin, sponsorship or approval of the goods in question is highly relevant to an inquiry concerning the similarity of the two dresses. When prominently displayed it can go far towards eliminating any possible confusion . . ." *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc*., 973 F.2d 1033, 1046 (2d Cir. 1992); *see also Nora Beverages*, 164 F.3d at 744 ("[T]he likelihood of confusion analysis must consider the elements for which protection is claimed in the context of the entire trade dress. Therefore, Nora can claim protection for its bottle shape if it is distinctive and non-functional, but defendants' labels must be considered in the . . . analysis." (internal citation omitted)). The Court finds that although the two trade dresses share some similar elements, the overall impression of the KIND trade dress differs significantly from the MOJO trade dress. This factor weighs in favor of Defendant.

As explained by Mr. Lubetzky, the packaging of most brands can be categorized "into two types of motifs." (Tr. 118:17 [Dkt. No. 63]). One motif is packaging that emphasizes "straight lines" and "minimiz[es] curvature," and the other motif is packaging "which has some elements of curvature, either dominant or some degree." (*Id.* 118:21–23).

KIND's trade dress is best described as "minimalist," (*id*. 41:8), "simple," (*id.* 41:11) "clean," (*id.* 150:4), "modern," (*id.* 118:6–9); (Lubetzky Decl. ¶ 9), and "sleek," (Tr. 118:6–9); (Lubetzky Decl. ¶ 9); *see also* (Tr. 149:18–23 (Lubetzky, testifying) ("THE COURT: [Y]ou make a point that you have made repeatedly on the stand that your preference, for example, the typeface on the Kind snack wrapper is simple, clean, and modern. THE WITNESS: Not just the type, but the design itself.")). The philosophy of the KIND trade dress, as summarized by Mr.

Lubetzky, is as follows:  "we try to keep it simple and not use – not complicate things by graduations [sic], by textures, by wallpaper motifs, we try to keep it very, very clean."  (*Id.* 150:1–4).  The trade dress connects with core concepts underlying the KIND brand and communicates the integrity and simplicity of the product's ingredients.  *See, e.g.*, (*Id.* 38:5–7) (Lubetzky, testifying) ("At its core, the KIND brand[] is about transparency.  It's about simplicity.  It's about straightforwardness.  It's about saying more with less."); (Lubetzky Decl. ¶ 9) ("We designed a trade dress for KIND bars which would resonate with the core brand proposition (simple, whole ingredients you can see and pronounce) and which would convey a . . . sleek, and modern impression on store shelves.").  KIND achieves its look through the "straight line approach," (Tr. 118:10–12), described above.

The MOJO trade dress differs from the KIND trade dress in its color scheme, fonts, and number and placement of design elements.[5]  (Cleary Decl. ¶ 37); (Rosen Decl. ¶ 25).  In contrast

---

[5] A list of the specific differences include:

- Clif Bar uses its registered Clif design mark as a house mark, as well as its registered MOJO design mark; KIND uses the KIND design mark and no secondary mark.
- Clif Bar presents the Clif house mark vertically, on a red field on the far left corner of its package, while KIND presents its KIND house mark beneath four color panels on the right side of its packaging.
- Clif Bar uses the phrase "trail mix bar"; KIND has no comparable phrase.
- Clif Bar uses an arrow shaped banner behind the MOJO mark, and another slant-edged colored banner with the flavor description; KIND uses no similar banners.
- Clif Bar has chosen the color black as the background color for the MOJO line, across all flavors; KIND uses an array of colors as the background.
- Clif Bar's transparent window is to the right of its branding; KIND's transparent window is to the left of its branding.
- Clif Bar's transparent window is bisected by two adjacent, differently configured and colored banners on the upper third of the packaging; KIND's transparent window is bisected by a narrower continuous black horizontal stripe running roughly two-thirds of the way down the package.
- Clif Bar's arrow bullet points are on the left of the window; KIND's check-mark bullet points are to the right of its window.
- Clif Bar's product flavor descriptions are presented in the colored slant-edged banner to the right of its Clif MOJO banner; KIND's product flavor description is presented in the black bar to the left of its KIND design mark.
- KIND uses a metallic band on its packaging; Clif MOJO does not.
- The transparent window on the Clif MOJO packaging has a mountain displayed across the bottom; KIND does not have this motif.
- Clif MOJO uses a combination of gloss and matte packaging; KIND uses entirely gloss packaging.

to KIND's minimalist look, the MOJO trade dress has many embellishments.  And rather than an exclusive straight line approach, the MOJO dress combines straight lines with curves (e.g., in the large curved "J" of MOJO; the cursive font used to describe the product-line; and the mountain displayed along the bottom of the packaging).  *See, e.g.*, (Tr. 150:5–16 (Lubetzky, testifying) ("THE COURT: And you avoid curves.  THE WITNESS: Correct.  THE COURT: Now MoJo, the word 'MoJo' has both shading on the letters and, of course, the letter J is curved, and 'fruit and nut' are written in a script rather than a clean boxy typeface.  THE WITNESS: Correct. THE COURT: It would seem that the 'MoJo' name and 'fruit and nut' writing would not be adopted by your company because neither is as clean -- THE WITNESS: I agree, your Honor. THE COURT: -- as yours.")).  The MOJO trade dress with its arrow banner indicating movement and mountain imagery connects with the core concepts underlying the Clif Bar and MOJO brands—energy and outdoor adventure—concepts that are different from those underlying the KIND brand.  *See, e.g.*, (*Id.* 394:23–24 (Cleary, Testifying) ("[T]he core of [the MOJO] brand is to be energizing and moving people into motion.") [Dkt. No. 67]); (*Id.* 396:23– 25 (Cleary, Testifying) ("[W]hat we were really trying to do here with the MoJo design was create a sense of energy that is flowing through the package . . . .")); (*Id.* 387:6–7 (Cleary, Testifying) ("[T]he Clif brand is about outdoors, it's about adventure . . . .")); (*Id.* 397:18–19 (Cleary, Testifying) ("[P]art of our heritage, a big part of it, is being in the  outdoors . . . .")).  In addition, the prominent use of the MOJO mark and the use of the Clif Bar mark, which has an 87% aided awareness, (*Id.* 388:12–19), tends to dispel any confusion as to the origin or

---

- KIND's flavors are always written in white font against a black background; Clif Bar's flavors are written in a different color that changes with each flavor.

 (Cleary Decl. ¶ 37); (Rosen Decl. ¶ 25).   The Court basis its decision on the overall impression of the two trade dresses and not a side-by-side comparison.

sponsorship of the product.[6]  *See* (PX 83 (physical Clif MOJO Coconut Almond Peanut bar

bearing MOJO and Clif Bar marks)).

### iii.   Competitive Proximity

This factor is not disputed.  Both products are healthy snack bars and compete in the

same market.  This factor weighs in favor of Plaintiff.

### iv.   Bridging the Gap

"Because the parties in this case are already competitively proximate, there is no gap to

bridge and so this factor is irrelevant."  *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F.

Supp. 2d 515, 531 (S.D.N.Y. 2011) (Sweet, J.), *aff'd*, 511 F. App'x 81 (2d Cir. 2013).

### v.   Actual Confusion

Although evidence of actual confusion "is not necessary to show likelihood of confusion,

its lack may under some circumstances be used against a plaintiff."  *Hasbro, Inc. v. Lanard Toys,*

*Ltd.*, 858 F.2d 70, 78 (2d Cir. 1988) (internal citation omitted).  Such an inference is unjustified

---

[6] KIND argues that application of the *Bristol-Myers* rule is not appropriate here because (1) neither the KIND nor the Clif house marks constitute the most prominent feature of their respective trade dresses, (Post-Hrg. Mem. of Law in Supp. 15 [Dkt. No. 61]); (2) the KIND, Clif, and MOJO marks enjoy "nowhere near the almost-universal recognition of the brands 'Excedrin' and 'Tylenol,'" the brands discussed in *Bristol-Myers*, (*id.*); and, (3) the record demonstrates that many consumers are more likely to remember the KIND packaging than its name, (*id.*).  The Court disagrees.  First, it is not necessary to find that the marks are the most prominent features of the respective trade dresses in order to apply the *Bristol-Myers* rule.  *C.f. Conopco, Inc.*, 49 F. Supp. 2d at 250–51 (applying the *Bristol-Myers* rule, but not discussing whether the mark was the most prominent feature of the trade dress).  In any case, the KIND logo is one of the most prominent features of the KIND dress (the only more prominent feature is the transparent window) and, although KIND is correct that the Clif mark is not the most prominent feature of the MOJO trade dress, the MOJO mark is the second most prominent feature of the MOJO dress (after the transparent window).  Second, courts have applied the *Bristol-Myers* rule in cases concerning products that do not have "almost-universal" name recognition.  *See, e.g., Nora Beverages, Inc.*, 164 F.3d at 744, App'x A. (2d Cir. 1998) (applying *Bristol-Myers* rule to the NAYA, Arrowhead, Poland Spring, and Zephyr Hills water bottles); *Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431, 455–56 (S.D.N.Y. 2000) (Sweet, J.) (applying *Bristol-Myers* rule to trade dress of Best Cellars and Grape Finds stores); *Conopco*, 49 F. Supp. 2d. at 250–51 (applying *Bristol-Myers* rule to ROMANCE and ETERNITY perfumes).  Third, although the Court notes that Mr. Lubetzky provided anecdotes of interactions he has had with consumers who know his product by its trade dress and not its name, Mr. Lubetzky did not testify that these consumers recognized KIND bars only through the six elements of the trade dress KIND seeks to protect here (and not, for example, the trade dress sought to be protected here *and* the four-colored panel KIND logo) and KIND provided no further evidence to support this claim.

when the allegedly infringing product is new to the market.  *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986).  The Court finds that the evidence of actual confusion is weak.  This factor weighs slightly in favor of Plaintiff.

KIND presents both direct evidence and anecdotal evidence of actual confusion.  The direct evidence is a consumer survey conducted by George Mantis.  *See* (Mantis. Decl. [Dkt. No. 10]); (Mantis Reply Decl. [Dkt. No. 42]).  The anecdotal evidence consists of an observational study conducted by Sarah Butler, *see* (Butler Decl. [Dkt. No. 43]); (Butler Reply Decl. (PX 191)), a declaration of a potential consumer, *see* (Getz Decl. [Dkt. No. 44]), and social media posts, (PX 221).  Clif Bar offers a criticism of the Mantis and Butler surveys and a counter-survey by Dr. Michael Rappeport.  *See* (Rappeport Decl. [Dkt. No. 35]); (Rappeport Reply Decl. [Dkt. No. 56]).

The consumer survey conducted by Mr. Mantis found a 15% net confusion rate.  (Mantis Decl. ¶ 17).  Although case law indicates that a 15% net confusion rate may be sufficient to show actual confusion, *see, e.g.*, *Borghese Trademarks Inc. v. Borghese*, 10 Civ. 5552, 2013 WL 143807, at *11 (S.D.N.Y. Jan. 14, 2013) (Oetken, J.), confusion rates of 15% are on the lower end of rates that courts within this Circuit have found sufficient to show actual confusion.  *See, e.g.*, *U.S. Polo Ass'n, Inc.*, 800 F. Supp. 2d at 532, 535–36 (holding that surveys showing 27.8%, 22.5%, and 17.8% net confusion rates were sufficient to prove actual confusion); *Gross v. Bare Escentuals Beauty, Inc.*, 641 F. Supp. 2d 175, 191 (S.D.N.Y. 2008) (Carter, J.) (34.5% and 47% net confusion sufficient to show actual confusion); *Energybrands, Inc. v. Beverage Marketing USA, Inc.*, 02 Civ. 3227, 2002 WL 826814, at *2 (S.D.N.Y. May 1, 2002) (Rakoff, J.) (17% net consumer confusion sufficient to show actual confusion); *Masterfoods USA v. Arcor USA, Inc.*, 230 F. Supp. 2d 302, 311 (W.D.N.Y. 2002) (29.22% net confusion sufficient to show actual

confusion); *Volkswagen Astiengesellschaft v. Uptown Motors*, No. 91 Civ. 3447, 1995 WL 605605, at *5 (S.D.N.Y. May 11, 1995) (Cote, J.) (17.2% and 15.8% net confusion sufficient to prove actual confusion); *Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 131 (S.D.N.Y. 1993) (Leisure, J.) (26% net confusion sufficient to show actual confusion).[7]

In addition, Dr. Rappeport credibly testified that the Mantis survey was flawed because it measured whether there was confusion, but not what *caused* the confusion. (Tr. 226:7–10 [Dkt. No. 65]). As explained by Dr. Rappeport:

> [W]hen you have multi element trade dress, a key element . . . is that the multiple elements -- all of them . . . collectively could be causing the confusion or individual elements could be causing the confusion or maybe some combination of elements could be causing the confusion. And the problem. . . is that [Mr. Mantis] doesn't address that because his control has none of the elements. So all he is measuring, all he possibly can measure is all or none; that is, either all the elements combined are causing the confusion or none. He has no way of measuring or seeing whether one or two elements of the trade dress are the ones causing the confusion and the others are simply superfluous . . .

(*Id.* 227:7–21).[8] As a result, the survey may have underestimated the level of noise and thus overestimated the level of actual confusion. (Rappeport Decl. ¶¶ 5–6).

---

[7] In an effort to demonstrate that the 15% net confusion rate had "flown over the bar," (Tr. 562:2 [Dkt. No. 69]), KIND's counsel recounted the evolution of confusion methodologies, (Tr. 565:7–568:7), and emphasizes that "in the past, courts have found confusion rates in the 15% range, even where such rates reflected 'gross' rather than 'net' confusion." (Post-Hrg. Mem. of Law. In Supp. 4). The fact that in the past courts accepted gross confusion rates in the 15% range to be sufficient does not change the Court's analysis. *See* 6 McCarthy on Trademarks and Unfair Competition § 32:187 (4th ed. 2014) ("As courts have become more sophisticated in evaluating trademark survey results, judges have come to expect that a proper survey will have a control."). Even KIND's counsel stressed that he was "not suggesting that we should go back to the bad old days." (Tr. 567:12–13).

[8] In the Mantis survey, for each product shown, respondents were asked: "Do you think this brand of [snack bars] is or is not made by or made with the approval or sponsorship of the same company that makes the [corresponding type of product] you saw in the earlier photo?" For respondents who answered in the affirmative, this question was followed by: "What makes you say that?" followed by "Anything else?" (Mantis Decl. ¶ 14). The verbatim responses to the "What makes you say that?" and "Anything else?" questions demonstrate that the survey shows that there was confusion, but not what caused the confusion. For example, some responses cited the similar packaging, *see, e.g.*, (2,278,306 ("The package is similar."); 13,989,733 ("Looks like the same type [sic] wrapper."); 14,910,524 ("the package looks exactly the same as the kind bars I saw earlier.")), while other responses cited the similar flavors of the KIND and MOJO bars, *see, e.g.*, (4,357,938 ("They have the same flavors, and are both healthy snack bars."); 13,859,844 ("Fruit and nut was on most of the packaging with the exception of the chocolate bar I believe. Looks like a higher quality of the same bars."); 15,276,734 ("flavors of the bars are exactly the

Because the Mantis survey shows only 15% net confusion, and in light of Dr. Rappeport's credible criticisms of the survey, and all other *Polaroid* and marketplace factors weighing in favor of Defendant, the Court gives little weight to the survey.  *See* 6 McCarthy on Trademarks and Unfair Competition § 32:188 (4th ed. 2014) (cautioning that "survey confusion numbers that go below 20% need to be carefully viewed against the background of other evidence weighing for and against a conclusion of likely confusion").

Ms. Butler's anecdotal evidence of confusion consists of confusion in only one of the two customers who chose a MOJO bar.  That one consumer thought that the MOJO bar he had selected was a KIND bar.  (Butler Decl. ¶ 21).  However, the consumer replied, "no clue" to the interviewer's question, "What can you tell me about the energy bar you selected?"  (*Id.* Ex. D). In addition, he told the interviewer that he was looking for a KIND bar because his "[d]aughter told him to purchase it."  (*Id.*).  This does not demonstrate actual confusion because "the correct test is whether a consumer who is *somewhat familiar* with the plaintiff's [dress] would likely be confused when presented with defendant's [dress] alone."  *Toy Mfrs. of Am., Inc. v. Helmsley-Spear, Inc.*, 960 F. Supp. 673, 681 (S.D.N.Y. 1997) (Scheindlin, J.) (internal quotation marks omitted) (emphasis added).

In addition, Ms. Getz, a potential consumer who shares an apartment with a KIND employee, selected a MOJO bar, believing it to be a KIND bar, from a bowl of snacks in her

---

same."); 149,028,141 ("They had the exact same titles for each of the different bars."), others cited both the packaging and similarity in flavors, *see, e.g.*, (14,551,199 ("Same packaging, which says fruit."); 15,456,620 ("The packaging looks very familiar and the flavors are very close to the same."); 149,079,722 ("The packaging and the flavors.")), and still others cited completely irrelevant considerations, *see, e.g.*, 2,959,724 ("These are very nice packages and I was looking for a special Valentine gift along these lines anyway, so it is exciting to encounter new products with better ingredients."); 10,955,032 ("I think this would be in every store and people would love to buy them.").  KIND argues that "Clif's arguments based on verbatim responses should be disregarded" because "Mr. Mantis testified that he did not base his opinion on the verbatim responses."  (Post-Hrg. Reply Mem. of Law in Supp. 5).  However, Mr. Mantis, in his report states clearly that, "[m]ost of these respondents specifically cited similarities in the trade dress as the basis of this mistaken belief," and goes on to highlight specific responses that indicated the packaging as the source of confusion.  (Mantis. Decl. ¶ 15).

apartment.  (Getz Decl. ¶¶ 4–8).  However, Ms. Getz's confusion may have resulted from her expectation to find KIND bars in her home because of her roommate's employment at KIND. *See* (*Id.* ¶ 3); (Tr. 421:1–12 ("Q. And does she from time to time bring home Kind bars from work?  A. Yes, she does. Q. And so do you frequently have Kind bars in your household? A. Yes, we do. Q. And do you usually keep them in the fruit bowl that you mentioned earlier? A. She actually normally keeps boxes in her room. She has put them in this bowl before, but she puts other types of bars and granola bars in this bowl. Q. But have Kind bars been in that bowl? A. Yes, they have.")).  Ms. Getz's confusion is therefore not probative of the average consumer in marketplace conditions.  *See, e.g.*, *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 327 (S.D.N.Y. 2000) (Sprizzo, J.), *aff'd sub nom. Paco Sport, Ltd. v Paco Rabanne Perfumes*, 234 F.3d 1262 (2d Cir. 2000) ("[T]he witnesses' reactions do not reflect the reactions of an average consumer, because the witnesses' association with Paco Rabanne heightens their sensitivity to the brand.").

The social media posts KIND has submitted are mostly unhelpful.  (PX 221 Ex. A–D). The comments on Clif Bar's Facebook posts note similarities between the MOJO bars and KIND bars.  *See, e.g.*, (*Id.* Ex. A (comment on Clif Bar's Facebook post introducing two MOJO flavors stating, "I love all things Clif and I'm sure I'll like these too, but don't they kinda look like Kind bars?")).  However, "assertions of similarity . . . do nothing to establish consumer confusion that enables a seller to pass off his goods as the goods of another, the definition of actual confusion under the Lanham Act."  *Scholastic Inc. v. Speirs*, 28 F. Supp. 2d 862, 872 (S.D.N.Y. 1998) (Mukasey, J.), *aff'd*, 199 F.3d 1323 (2d Cir. 1999) (internal quotation marks omitted); *see also U.S. Shoe Corp. v. Brown Grp., Inc.*, 740 F. Supp. 196, 200 (S.D.N.Y. 1990) (Leval, J.), *aff'd*, 923 F.2d 844 (2d Cir. 1990) ("To say that defendant's ads remind consumers of plaintiff's ads is

SPA-20

very different from saying that they confuse consumers as to the source."). KIND also submits a twitter post in which a twitter user wrote, "I was about to pick up one of those [MOJO bars] because I thought it was a Kind Bar at the vitamin shop . . . ." (PX 221, Ex. D). This type of initial interest confusion is actionable and therefore this post supports Plaintiff. *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 n.2 (2d Cir. 2005) ("The Lanham Act protects against several types of consumer confusion, including . . . *initial interest* confusion and *post-sale* confusion . . . . " (internal citations omitted)).

Taken as a whole, KIND's evidence of actual confusion is weak; this factor weighs slightly in favor of Plaintiff.

### vi. **Bad Faith**

"Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products." *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 388 (2d Cir. 2005). The evidence presented by KIND does not demonstrate that Clif Bar adopted its new MOJO trade dress with the intent to deceive consumers into believing the MOJO bar was made or sponsored by KIND. This factor weighs in favor of Defendant.

Although the evidence presented by KIND reveals that Clif Bar used the KIND trade dress as a model for its redesigned MOJO packaging, "[t]he intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product." *Streetwise Maps, Inc.*, 159 F.3d at 745. The fact that the MOJO packaging prominently displays the MOJO mark and also displays the Clif mark, and uses a trade dress dissimilar to KIND's "minimalist" trade dress, negates an inference of intent to deceive consumers as to the source of the product. *See, e.g., Nora Beverages, Inc.*, 269 F.3d at

20

125 ("[B]y placing its labels prominently upon its bottles, PGA negated an inference of intent to

deceive consumers as to the source of its product.").

vii.    <strong>Quality</strong>

"This factor is primarily concerned with whether the senior user's reputation could be

jeopardized by virtue of the fact that the junior user's product is of inferior quality." *The Sports*

*Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 965 (2d Cir. 1996) (internal quotation marks

omitted). Because the Court lacks evidence about the quality of KIND and MOJO bars, this

factor does not play into its analysis.

viii.    <strong>Sophistication of Buyers</strong>

When applying this factor, the court "must consider the general impression of the

ordinary consumer, buying under normal market conditions and giving the attention such

purchasers usually give in purchasing the product at issue." *Streetwise Maps, Inc.*, 159 F.3d at

746. "[T]he more sophisticated and careful the average consumer of a product is, the less likely

it is that similarities in trade dress . . . will result in confusion concerning the source or

sponsorship of the product." *Bristol-Myers Squibb Co.*, 973 F.2d at 1046. "Generally,

purchasers of small items . . . are considered casual purchasers prone to impulse buying."

*W.W.W. Pharm. Co., Inc. v. Gillette Co*., 984 F.2d 567, 575 (2d Cir. 1993). Because the

evidence presented to the Court supports both that some purchasers of healthy snack bars are

casual purchasers and some are careful purchasers, the Court gives little weight to this factor in

its analysis.

KIND argues that, "[r]elatively low-cost snack items, including KIND bars and MOJO

bars (about $2 per bar), are often impulse purchases, placed near a store's checkout counter or at

the end of aisles in grocery stores." (Mem. of Law in Supp. 16). Clif Bar disagrees, arguing that

21

KIND bars and MOJO bars "are premium snack foods sold at premium price." (Mem. of Law in Opp. 21). Clif Bar asserts that purchasers of healthy snack foods "are well-educated, concerned about the nutritional benefits and calorie counts of the bars they consume, and typically brand loyal." (*Id.*).

There is evidence on the record to support both positions. KIND submitted data showing that 47.9% of retail outlets that sell KIND bars sell them in a "primarily impulse" setting (defined as convenience stores or "emerging channels"), supporting KIND's argument. (PX 211). However, Mr. Lubtezky testified that the "primarily impulse" setting is not where KIND derives most of its sales volume, (Tr. 519:1–4), and KIND submitted a study that found that 77.3% of KIND's sales volume is generated by frequent purchasers (defined as those who eat one bar or more a day or those who eat a bar several times a week), supporting Clif Bar's argument. (PX 199, at 11). In addition, both CEOs testified that their respective brands enjoy strong brand loyalty. *See, e.g.*, (Tr. 388:12–19 (Cleary, testifying)); (*Id.* 514:16–17 (Lubetzky, testifying)).

Because both arguments are supported by the evidence on the record, the Court finds that some purchasers of healthy snack bars are likely to be casual purchasers prone to impulse buying, while others are likely to be careful purchasers. The Court therefore gives little weight to this factor in its analysis. *See, e.g.*, *Olay Co., Inc. v. Cococare Products, Inc.*, 81 Civ. 4102, 1983 WL 62351, at *13, *18 (S.D.N.Y. Apr. 19, 1983) (Sweet, J.) (giving sophistication of the buyers factor "little weight in the analysis" because "[a]side from common knowledge, no objective evidence was presented to bear on the length of the process by which the purchasing decision is arrived at" and "the record shows that some consumers are careful purchasers of these products while others are not").

ix.    **Other Marketplace Factors**

Other marketplace factors weigh in favor of Clif Bar.  The "caddies" or "inner cases" in which these products are often sold, and the point of sale displays Clif Bar has provided retailers, all prominently bear the MOJO and Clif marks, thus dispelling confusion as to the origin or sponsorship of the product.  *See* (Cleary Decl. ¶¶ 51, 52).  Also helping to dispel confusion is that many MOJO and Clif bars are sold through mass market and grocery stores, (*id.* ¶ 50); (Tr. 519:1–4 (Lubetzky, testifying)), where MOJO bars are often grouped with other Clif Bar products and KIND bars are often grouped with other KIND products, (Cleary Decl. ¶ 50).

x.    **Balancing**

Balancing all of the *Polaroid* factors and the additional marketplace factors described above, the Court finds that Plaintiff has not demonstrated a likelihood of consumer confusion.

A. *Irreparable Harm*

KIND argues that if the Court "does not enjoin the new MOJO bar's trade dress, KIND will suffer real and irreparable harm in the form of lost goodwill and market share as customers are confused into buying MOJO bars when they mean to buy KIND bars."  (Mem. of Law in Supp. 21–22).  In light of the Court's finding that KIND has failed to establish likelihood of confusion, KIND's claim of potential lost goodwill and market share resulting from consumer confusion also fails.

B. *Alternate Standard*

Alternatively, the Court may issue a preliminary injunction if KIND can show that (1) sufficiently serious questions exist going to the merits of its case and that these questions are fair ground for litigation, and (2) the balance of hardships tips decidedly in its favor.  *Christian*

*Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d at 215.  The Court finds that

KIND has failed to meet its burden, because the balance of hardships weighs in favor of Clif Bar.

Clif Bar alleges that its sunk costs for the new MOJO products totals approximately

$13.9 million, which includes Clif Bar's:

> inventory of products manufactured to date, which are in . . .
> warehouses and ready to ship; the value of inventory already
> shipped and at retail; . . . contracted ingredient and marketing
> commitments; R&D development costs; the cost of sales kits,
> merchandising shippers, plan-o-grams and reset work; and the
> forecasted loss of sales from Clif Bar products discontinued to
> make room for new CLIF MOJO products on the shelf.

(Cleary Decl. ¶ 55).  KIND's proposal to give Clif Bar a three-month period to sell off its

remaining inventory, (Tr. 593:23–594:1), would reduce its losses as to only the first category.

(Post-Hrg. Mem. of Law in Opp. 25 [Dkt. No. 72]).  In addition, Clif Bar estimates that it would

cost it approximately $500,000 and take eight months to develop and manufacture new

packaging.  (Cleary Decl. ¶ 57).  During that eight-month redesign period, Clif Bar estimates that

it would lose $10 million in revenue, (*id.*), and also lose a "window of opportunity to meet

consumer demand and develop brand loyalty."  (*Id.* ¶ 58).  Clif Bar alleges that it would also

suffer reputational harm due to its inability to fulfill commitments to the industry and consumers.

(*Id.*).

KIND argues that the $13.9 million figure fails to account for ingredients that could be

repurposed and includes product and flavor R&D, a cost which would not be lost by packaging

the MOJO bar in a different trade dress.  (Post-Hrg. Reply Mem. of Law in Supp. 9–10 [Dkt. No.

73]).  Mr. Lubetzky testified that, if needed, he could redesign the KIND trade dress in three

months' time.  (Tr. 504:2–6).  Even if KIND is correct that Clif Bar's losses are not as high as it

claims and that it could design new packaging in three months, it is KIND's burden to show that

the balance of hardships decidedly tips in its favor.  KIND has failed to do so.  KIND argues that

the balance of hardships weighs in its favor because if an injunction is not issued it "will suffer

significant, irreparable harm." (Mem. of Law in Supp. 23). The irreparable harm is premised on

KIND's alleged loss of goodwill and market share as consumers are confused into buying MOJO

bars when they intend to buy KIND bars. (*Id.* at 21–22). As already discussed above, this

argument fails in light of the Court's finding that KIND has not established a likelihood of

consumer confusion. Therefore, even if KIND is correct that Clif Bar's losses are not as high as

it projects and that Clif Bar could redesign its trade dress in three months, the balance of

hardships still tips in Clif Bar's favor.

        C. *Public Interest*

KIND argues that the Court should issue a preliminary injunction because "[t]he public

interest is served by preventing customer confusion or deception." (*Id.* at 24). In light of the

Court's finding that KIND has failed to establish likelihood of consumer confusion, the Court

finds that the public interest would not be served by issuing a preliminary injunction in this case.

**III.    Conclusion**

For the foregoing reasons, the Court DENIES Plaintiff's motion for a preliminary

injunction.


       SO ORDERED.

Dated: New York, New York
      June 12, 2014

                      _____/s/_____
                      Kimba M. Wood
                      United States District Judge