# 14-2481-cv

## United States Court of Appeals

*for the*

## Second Circuit

KIND LLC,

*Plaintiff-Appellant,*

— v. —

CLIF BAR & COMPANY,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

KILPATRICK TOWNSEND & STOCKTON LLP
*Attorneys for Defendant-Appellee*
The Grace Building
1114 Avenue of the Americas, 21st Floor
New York, New York 10036
(212) 775-8700

## **CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure,

Defendant-Appellee Clif Bar & Company states that it has no parent corporation

and that there is no publicly held corporation owning 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................C-1

COUNTERSTATEMENT OF ISSUES PRESENTED..............................................1

COUNTERSTATEMENT OF THE CASE...................................................2

SUMMARY OF ARGUMENT ......................................................4

STATEMENT OF FACTS ......................................................8

STANDARD OF REVIEW ......................................................19

ARGUMENT ......................................................21

I.     THE DISTRICT COURT CORRECTLY CONCLUDED THAT
       KIND FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS
       ON THE MERITS OF ITS COMMON LAW TRADE DRESS
       INFRINGEMENT CLAIM UNDER SECTION 43(a) OF THE
       LANHAM ACT......................................................21

       A.     The District Court Properly Adopted KIND's Own Articulation
              Of Its Unregistered Trade Dress.........................................22

       B.     Packaging Trade Dress Is Not Ipso Facto Distinctive .......................27

              1.     KIND's Basic Product and Packaging Configurations
                     Are Not Protectable..................................................28

              2.     Generic Words and Devices Are Not Protectable ...................30

              3.     KIND Cannot Protect An Idea, Concept or Generalized
                     Type of Appearance ..................................................32

              4.     There Is No Presumption That Packaging Trade Dress Is
                     Distinctive ..................................................33

       C.     The District Court Correctly Concluded That KIND Failed To
              Prove That Its Articulated Trade Dress Functions As A Source
              Identifier ..................................................37

i

II.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT
       KIND FAILED TO CARRY ITS BURDEN OF PROVING THAT
       THE ALLEGEDLY INFRINGING TRADE DRESS IS LIKELY TO
       CAUSE CONFUSION ................................................................39

       A.    The District Court Properly Concluded That KIND's Alleged
             Trade Dress Is Weak ...........................................................40

       B.    The District Court Properly Concluded That The Parties'
             Packaging Is Not Confusingly Similar.................................41

       C.    The District Court Properly Concluded that KIND's Survey
             Failed to Show Actionable Confusion .................................45

             1.    KIND's Survey Failed To Identify the Cause of the
                   Alleged Confusion .................................................47

             2.    Clif Bar's Survey Demonstrated That The Confusion
                   Level Reported by Mr. Mantis Was Triggered by See-
                   Through Packaging Alone .......................................52

III.   THE DISTRICT COURT CORRECTLY CONCLUDED THAT
       KIND HAS FAILED TO DEMONSTRATE IRREPARABLE HARM ......54

CONCLUSION ....................................................................................57

# TABLE OF AUTHORITIES

## Cases

*20th Century Wear, Inc. v. Sanmark-Stardust, Inc.*,
　　815 F.2d 8 (2d Cir. 1987) ........................................................ 37, 38

*24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC.*,
　　447 F. Supp. 2d 266 (S.D.N.Y. 2006),
　　*aff'd*, 247 F. App'x 232 (2d Cir. 2007) ................................. 48, 51

*Abercrombie & Fitch Co. v. Hunting World, Inc.*,
　　537 F.2d 4 (2d Cir. 1976) ...........................................................30

*Am. Express Fin. Advisors, Inc. v. Thorley*,
　　147 F.3d 229 (2d Cir. 1998) .......................................................19

*Aromatique, Inc. v. Gold Seal, Inc.*,
　　28 F.3d 863 (8th Cir. 1994) ........................................................28

*Ashcroft v. Am. Civil Liberties Union*,
　　542 U.S. 656 (2004)....................................................................19

*Bose Corp. v. Linear Design Labs*,
　　467 F.2d 304 (2d Cir. 1972) .......................................................43

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*,
　　973 F.2d 1033 (2d Cir. 1992) ............................ 20, 22, 37, 42, 43

*Car-Freshener Corp. v. S.C. Johnson & Son, Inc.*,
　　70 F.3d 267 (2d Cir. 1995) .........................................................30

*Christian Louboutin SA v. Yves Saint Laurent Am. Holdings, Inc.*,
　　696 F.3d 206 (2d Cir. 2012) .......................................................44

*City of N.Y. v. Golden Feather Smoke Shop, Inc.*,
　　597 F.3d 115 (2d Cir. 2010) .......................................................19

*Coach Leatherware Co. v. AnnTaylor, Inc.*,
    933 F.2d 162 (2d Cir. 1991) ................................................................. 37, 38

*Conopco, Inc. v. Cosmair, Inc.*,
    49 F. Supp. 2d 242 (S.D.N.Y. 1999) ........................................................41

*Dixie Vortex Co. v. Lily-Tulip Cup Corp,*,
    19 F. Supp. 511 (E.D.N.Y. 1937) ............................................................28

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)...............................................................................54

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*,
    111 F.3d 993 (2d Cir. 1997) ........................................................ 20, 23, 33

*Funrise Canada (HK) Ltd. v. Zauder Bros., Inc.*,
    1999 WL 1021810 (E.D.N.Y. July 2, 1999) ......................................... 24, 41

*Ga.-Pac. Consumer Prods. LP v. Kimberly-Clark Corp.*,
    647 F.3d 723 (7th Cir. 2011) ..................................................................32

*Genesee Brewing Co. v. Stroh Brewing Co.*,
    124 F.3d 137 (2d Cir. 1997) ...................................................................31

*Germanow v. Standard Unbreakable Watch Crystals, Inc.*,
    283 N.Y. 1 (1940)..................................................................................28

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
    481 F.3d 60 (2d Cir. 2007) ............................................................... 19, 20

*Havana Club Holding, S.A. v. Galleon S.A.*,
    203 F.3d 116 (2d Cir. 2000) ...................................................................20

*Hershey Foods Corp. v. Mars, Inc.*,
    998 F. Supp. 500 (M.D. Pa. 1998)...........................................................23

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*,
    58 F.3d 27 (2d Cir.1995) ................................................................. passim

*Johnson & Johnson * Merck Consumer Pharm. Co. v. SmithKline Beecham Corp.*, 960 F.2d 294, 300-01 (2d Cir. 1992) .......................... 20, 46

*Kaufman & Fisher Wish Co. v. F.A.O. Schwarz,* 184 F. Supp. 2d 311 (S.D.N.Y. 2001), *aff'd,* 51 F. App'x 335 (2d Cir. 2002) .................................... 24, 34

*Kellogg Co. v. Nat'l Biscuit Co.,* 305 U.S. 111 (1938) .................................................... 29, 35

*Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373 (2d Cir. 1997) ................................................ passim

*LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71 (2d Cir. 1985) ............................................ 28, 29, 41

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 454 F.3d 108 (2d Cir. 2006) ......................................................36

*Luv n' Care, Ltd. v. Mayborn USA, Inc.,* 898 F. Supp. 2d 634 (S.D.N.Y. 2012) ......................................43

*Luv N' Care, Ltd. v. Walgreen Co.,* 695 F. Supp. 2d 125 (S.D.N.Y. 2010) ......................................35

*Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.,* 679 F.3d 410 (6th Cir. 2012) ......................................................23

*Malaco Leaf AB v. Promotion in Motion, Inc.,* 287 F. Supp. 2d 355 (S.D.N.Y. 2003) .................................... 28, 45

*Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.,* 65 F.3d 1063 (2d Cir. 1995) ......................................................34

*Mattel, Inc. v. Azrak-Hamway, Int'l, Inc.,* 724 F.2d 357 (2d Cir. 1983) ......................................................37

*Medisim Ltd. v. BestMed LLC,* 910 F. Supp. 2d 591 (S.D.N.Y. 2012) ......................................24

*Merriam Webster, Inc. v. Random House, Inc.*,
 35 F.3d 65 (2d Cir. 1994) ..................................................... 43, 44

*Metro Kane Imps., Ltd. v. Rowoco, Inc.*,
 618 F. Supp. 273 (S.D.N.Y. 1985), *aff'd,* 800 F.2d 1128 (2d Cir. 1986) .....38

*N.Y. City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
 704 F. Supp. 2d 305 (S.D.N.Y. 2010) ..........................................57

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,
 269 F.3d 114 (2d Cir. 2001) ................................................. 29, 39

*Original Appalachian Artworks, Inc. v. Blue Box Factory (USA), Ltd.*,
 577 F. Supp. 625 (S.D.N.Y. 1983) .............................................28

*Otokoyama Co., Ltd. v. Wine of Japan Imp., Inc*.,
 175 F.3d 266 (2d Cir. 1999) ..................................................31

*P.F. Cosmetique S.A, v. Minnetonka, Inc.*,
 605 F. Supp. 662 (S.D.N.Y. 1985) ............................................36

*Power Controls Corp. v. Hybrinetics, Inc.*,
 806 F.2d 234 (Fed. Cir. 1986) ...............................................28

*Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc*.,
 754 F.2d 91 (2d Cir. 1985) ..................................................54

*Qualitex Co. v. Jacobson Prods. Co.*,
 514 U.S. 159 (1995)..........................................................30

*Reese Publ'g Co. v. Hampton Int'l Commc'ns, Inc.*,
 620 F.2d 7 (2d Cir. 1980) ...................................................30

*Regal Jewelry Co. v. Kingsbridge Int'l, Inc.*,
 999 F. Supp. 477 (S.D.N.Y. 1998) ...........................................34

*RJR Foods, Inc. v. White Rock Corp.*,
 603 F.2d 1058 (2d Cir. 1979) ...............................................42

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010) ........................................................................54

*Star Indus., Inc. v. Bacardi & Co. Ltd.*,
    412 F.3d 373 (2d Cir. 2005) .....................................................................36

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
    588 F.3d 97 (2d Cir. 2009) .......................................................................39

*Stormy Clime Ltd. v. ProGroup, Inc.*,
    809 F.2d 971 (2d Cir. 1987) .....................................................................44

*THOIP v. Walt Disney Co.*,
    690 F. Supp. 2d 218 (S.D.N.Y. 2010) ......................................................48

*Time, Inc. v. Petersen Publ'g Co.*,
    173 F.3d 113 (2d Cir. 1999) .....................................................................41

*Tough Traveler, Ltd. v. Outbound Prods.*,
    989 F. Supp. 203 (N.D.N.Y. 1997) ...........................................................43

*Toy Mfrs. of Am., Inc. v. Helmsley-Spear, Inc.*,
    960 F. Supp. 673 (S.D.N.Y. 1997) ...........................................................56

*Traffix Devices, Inc. v. Marketing Displays, Inc.*,
    532 U.S. 23 (2001) ............................................................................ 21, 30

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
    505 U. S. 763 (1992) .................................................................................21

*VIP of Berlin, LLC v. Town of Berlin*,
    593 F.3d 179 (2d Cir. 2010) .....................................................................19

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
    529 U.S. 205 (2000)........................................................................... 21, 34

*Winner Int'l LLC v. Omori Enterprises, Inc.*,
    60 F. Supp. 2d 62 (E.D.N.Y. 1999) ....................................................43, 51

*Yurman Design, Inc. v. PAJ, Inc*.,
    262 F.3d 101 (2d Cir. 2001) ................................................................. 22, 23

**Statutes**

15 U.S.C. § 1052(e)(5) ...........................................................................30

15 U.S.C. § 1115(b)(4) ..........................................................................30

15 U.S.C. § 1125(a) ......................................................................... passim

15 U.S.C. § 1127 ...................................................................................23

15 U.S.C. § 1056 ...................................................................................31

28 U.S.C. § 2111 ..................................................................................20

**Rules**

21 C.F.R. § 101.3 ....................................................................... 15, 31, 40

21 C.F.R. § 101.4 ............................................................................ 31, 40

21 C.F.R. § 101.12 ......................................................................... 15, 40

**Other Authorities**

1 J. Thomas McCarthy, *McCarthy on Trademarks  and Unfair Competition*
    (4th ed. 2014) ...................................................................... passim

Shari Seidman Diamond, "Control Foundations: Rationales and Approaches"
    in *Trademark and Deceptive Advertising Surveys* 62, 215-16
    (Shari Seidman Diamond and Jerre B. Swann, eds., 2012)..........................51

Shari Seidman Diamond, "Reference Guide on Survey Research"
    in *Reference Manual on Scientific Evidence* 400
    (Fed. Judicial Ctr. 3d ed. 2011) ..................................................50

TMEP § 1202.02(c)(i)(A) ......................................................................30

TMEP § 1202.11 ....................................................................................36

TMEP § 1213.03(b) ................................................................................31

Defendant-Appellee Clif Bar & Company ("Clif Bar") submits the following brief in response to the opening brief ("KIND Br.") filed by Plaintiff-Appellant KIND LLC ("KIND").

## COUNTERSTATEMENT OF ISSUES PRESENTED

1. Did the District Court abuse its discretion in accepting the articulation of the unregistered multi-element trade dress pleaded by KIND to support its claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and finding that KIND failed to prove that its claimed trade dress is either inherently distinctive or has acquired secondary meaning?

2. Did the District Court commit clear error in finding that KIND's claimed trade dress is weak and the parties' packages for their healthy snack bars are not similar?

3. Did the District Court commit clear error in giving little weight to the survey conducted by KIND's expert, when he did not test whether the level of net confusion he found was caused by similarities in one or more unprotectable elements of KIND's alleged trade dress as opposed to that trade dress as a whole?

4. Did the District Court commit clear error in finding that KIND failed to prove irreparable harm?

5. Did the District Court abuse its discretion in denying KIND's preliminary injunction motion?

## **COUNTERSTATEMENT OF THE CASE**

This is a trade dress infringement case involving the see-through packaging of the parties' respective healthy snack bars, which KIND alleges are confusingly similar. KIND selected the two products depicted below to illustrate the product packaging at issue (A203 ¶¶ 3-4):

 

In fact, KIND uses a broad array of colors and designs on the end caps to differentiate its 24+ different flavors, and Clif Bar uses different colors on the slant-edged banners identifying its five different flavors (A213 ¶ 24; A729-31 ¶ 37; A926-33):

 

KIND moved for a preliminary injunction solely on its first claim for relief under Section 43(a) of the Lanham Act based on its alleged rights in a combination of packaging elements that conspicuously omits the KIND mark, logo, and overall graphic design covered by its trade dress registrations. To quote KIND's CEO and key fact witness Daniel Lubetzky, KIND's alleged trade dress includes the following elements:

> (1) packaging with a transparent, rectangular front panel through which a large portion of the bar itself can be seen; (2) a horizontal stripe bisecting the transparent front panel and containing the flavor of the bar in text; (3) a text description of the product line (e.g., "Fruit & Nut," "Plus," or "Nuts & Spices") in line with the horizontal stripe bisecting the transparent front panel; (4) a vertical black band, offset to the side of the package, containing a bulleted list of many of the bar's key healthful attributes; (5) opaque vertical bands, or end caps, at either edge of the product package; and (6) a 40g size, in a slender shape (the "KIND Trade Dress").

(A203 ¶ 3).

Following the production of thousands of documents in discovery, an extended evidentiary hearing conducted over five days, the testimony of eight fact and expert witnesses, the introduction of hundreds of exhibits, and two rounds of briefing, the District Court (Wood, J.) denied KIND's motion for a preliminary injunction. In a carefully reasoned 25-page opinion, the District Court found that the six-element trade dress articulated by KIND is not inherently distinctive, and so not protectable unless KIND can show that its alleged trade dress has acquired

3

secondary meaning as a source identifier for KIND; that KIND did not establish such secondary meaning; that there is no likelihood of confusion between the parties' respective packaging, in part because the overall look of the packaging is dissimilar; that KIND did not establish irreparable harm; and that the balance of hardships tipped in favor of Clif Bar.

## SUMMARY OF ARGUMENT

The District Court properly adopted KIND's own articulation of its unregistered trade dress in rejecting KIND's contention that Clif Bar's packaging for its premium CLIF MOJO snack bars is likely to create confusion as to source.

In light of the obvious and extensive differences between the parties' packaging, KIND made a tactical decision to cherry-pick six elements from its overall package design in order to try to support its allegations that the CLIF MOJO packaging is "deceptively similar" to KIND's trade dress (KIND Br. 11). KIND's complaint and motion papers identified KIND's trade dress by reference to these six elements (DE2 ¶ 14; A203 ¶ 3; DE9 at 8), and then underscored these same "six points of similarity" between the parties' respective packages (*see, e.g.,* DE2 ¶¶ 4, 26; A210 ¶ 20; DE9 at 2-3). In short, KIND—not the District Court— "defined the trade dress to consist of an abstraction comprised of six elements," and did so to color its argument that the similarities between the trade dresses at

4

issue are "striking" (KIND Br. 5, 11).  The District Court did not abuse its discretion in binding KIND to that definition.

The District Court correctly concluded that KIND failed to show that its articulated trade dress is distinctive.  KIND itself admitted that many elements of its claimed trade dress are functional, generic or merely descriptive, and thus not protectable.  KIND conceded that it has no exclusive right to make whole fruit and nut bars in a 40 gram size, which are made in this size by many different manufacturers in the intensively competitive snack bar market; that see-through packaging is functional because it shows the product within; that opaque end caps are functional because they cover the dead space in the package; that serrated end caps are functional because they permit the wrapper to be opened easily; that "fruit & nut" is the generic term for a type of snack bar containing fruits and nuts; and that KIND's flavor names refer to the common names of the characterizing ingredients in its bars.  KIND also agreed that it has no exclusive right to use a bulleted list of product attributes.  The record was replete with over thirty examples of food bars utilizing elements of KIND's alleged trade dress, including other fruit and nut bars previously sold by Clif Bar to which KIND never objected.

After analyzing all the evidence, the District Court concluded that KIND's alleged trade dress was descriptive.  Moreover, because KIND failed to adduce any evidence that its six element trade dress (without the KIND name and logo) had

5

achieved secondary meaning, the District Court found that KIND failed to establish protectable trade dress rights.

Although the District Court could have denied KIND's motion on that ground alone, it nevertheless conducted a full-blown likelihood of confusion analysis, and again ruled against KIND. Contrary to KIND's contentions on appeal, the District Court explicitly recognized that it "must consider whether the two products 'create the same general overall impression'" (SPA12). Basing "its decision on the overall impression of the two trade dresses," the District Court concluded that "[t]he MOJO trade dress differs from the KIND trade dress in its color scheme, fonts, and number and placement of design elements," and in other respects (SPA13, 14 n.5).

In reaching the conclusion that there is no likelihood of confusion, the District Court considered the survey evidence presented by both parties and concluded that, contrary to KIND's contentions, its survey by George Mantis did not establish "with scientific precision" that the net confusion level of 15% he reported was caused by any similarities in protectable trade dress (KIND Br. 13). Mr. Mantis's survey design failed to isolate confusion caused by individual non-protectable elements (such as functional see-through packaging or generic product and ingredient names), which many of his survey respondents specifically identified in response to his follow-up "What makes you say that?" questions. Clif

6

Bar's expert Dr. Michael Rappeport testified that this was a fundamental flaw in Mr. Mantis's survey design and that additional controls were needed to establish causation. Dr. Rappeport conducted his own survey, with proper controls, and confirmed his hypothesis that the level of confusion Mr. Mantis reported was substantially, if not entirely, triggered by see-through packaging, which is concededly functional. The District Court's decision to give little weight to KIND's survey evidence is—again—fully supported by the record.

KIND argues that "[t]he District Court's broad ruling that the KIND trade dress is not protectable is a clarion call to would-be infringers that they may try to copy the KIND trade dress with impunity" (KIND Br. 8). Yet the ruling below was quite narrow: KIND failed to carry its burden of proving both that (1) the motley collection of functional, generic and descriptive elements it identified as its common law trade dress serves as a source identifier, and (2) the specific packages at issue create the same overall commercial impression and create a likelihood of confusion in the marketplace. After all, apart from their functional film wrappers revealing the snack bars within, the most prominent feature of each party's package design is that party's own brand name and logo, clearly identifying the source of its product. Given this Court's deferential standard of review in preliminary injunction proceedings, the District Court's denial of KIND's motion should be affirmed.

## STATEMENT OF FACTS

Clif Bar

Founded in 1992, Clif Bar, a family and employee owned company, is the U.S. market leader in the highly competitive "portable healthy lifestyle" snack bar category (A718 ¶¶ 2-3). Clif Bar's trademarks enjoy enormous brand recognition and goodwill. The CLIF mark has 87% aided awareness in its industry category (A658 ll.4-22). Forbes named Clif Bar the #1 Breakaway Brand in its "Top Ten 2010 Breakaway Brands®" survey (ahead of Facebook, Apple, Disney, and other well-known companies), and Fortune magazine recognized Clif Bar in its 2011 list of "100 Great Things About America" (A721 ¶ 13). Clif Bar is committed to building its own sustainable brands and has no interest in passing its products off as anyone else's (A655 ll.15-23; A718-726 ¶¶ 2-14, 29; A739 ¶ 59; A677 l.22 – 678 l.15).

KIND

Twelve years after Clif Bar revolutionized the industry with its introduction of its now iconic CLIF BAR, and two years after Clif Bar launched its CLIF MOJO trail mix bars, KIND entered the market (A721-22 ¶¶ 15, 17). KIND began selling fruit and nut bars in 2004, the same year Clif Bar introduced its first CLIF MOJO fruit and nut flavors (A79 ll.19-20; A724-25 ¶¶ 24-27). KIND positioned itself with many of the same brand promises Clif Bar has always offered, such as

8

"social entrepreneurship" and "natural" whole ingredients, although Clif Bar's products are made with organic ingredients and KIND's are not (A139 ll.21-22; A722-23 ¶¶ 17-19).

Transparent Packaging

Transparent packaging was, of course, in widespread use in the food industry generally and the snack food industry in particular well before KIND adopted such packaging for its snack bars (A731-32 ¶¶ 39-40; A784-85 ¶¶ 4-6, 17; A779-82). Contrary to KIND's claims that it pioneered the use of transparent wrappers to show off the ingredients in its bars (A43 ll.5-10; A50 ll.3-18; A228-30 ¶¶ 17-20; A906; A908; A145 ll.20-22), it was preceded by the classic JOYVA bars, the BE NATURAL bars formerly sold (and still offered) in the U.S. through Mr. Lubetzky's own "not only for profit" Peaceworks website, and the EAT NATURAL bars currently sold in the U.S. through Walmart and Amazon (A831 ¶¶ 31-32, A891, A388, A924 ¶ 4, A83 ll.20-25, A107 l.22-108 l.4, A979 ll.4-25, A672 l.9, A 674 l.14). In July 2004, Marketing Magazine lauded the "honest packaging" of EAT NATURAL bars, with their transparent wrappers and "clear nutritional information, making health benefits easy to understand" and predicted that "[a]s concerns over obesity and the content of packaged food increase, the packaging of brands such as . . . Eat Natural snack bars will be imitated more and more" ("Packaging Integrity and Honesty To Be Key Brand Issues," A920-22).

By early 2014, excluding the parties' bars, there were at least 30 different brands of snack bars in see-through packaging offered for sale in the U.S. (A812 ¶ 6-A832 ¶ 32; A844-94; A939; A1154 [misnumbered A308]).  Notably, Clif Bar introduced see-through packaging for its base CLIF MOJO and  its CLIF C bars in 2010, without objection from KIND (A727-28 ¶¶ 32-33).

The CLIF MOJO Line of Products

The CLIF MOJO packaging has evolved over the years since Clif Bar first launched this line in 2002 but has consistently featured the CLIF and MOJO marks as well as a mountain motif and the descriptor "trail mix bar" (A726 ¶ 30).  In 2014, Clif Bar extended the line with the new premium CLIF MOJO fruit and nut and dark chocolate bars here at issue (A725 ¶ 27).  Clif Bar started research and development on these new premium products in 2011 and invested millions of dollars over a three-year period on research, focus groups, taste tests, and product and packaging development (A723-26 ¶¶ 20, 28, A529 ll.5-17, A600 ll.9-22, A659 ll.11-20, A660 l.19-A663 l.9).

Clif Bar focused on designing distinctive packaging to differentiate its new premium bars from both its existing CLIF MOJO products (which remain on the market) and its competitors' products (A667 l.6-A670 l.20, A683 l.12-A684 l.24).  Responding to identified consumer demand for honest food in honest packaging, Clif Bar prioritized the inclusion of larger transparent windows and clear nutrition

claims (A728 ¶ 34).  It selected the color black because it was part of the CLIF

MOJO brand heritage and connoted premium quality (A726-27 ¶¶ 30-31; A669

l.24-A670 l.4).  It chose a 40 gram size to keep the calorie count no higher than

200 calories per bar (A728 ¶ 35).

In the course of its research, Clif Bar reviewed its competitors' products and

packaging, just as KIND does (A134 l.18-A137 l.12, A448, A450-51, A454-55).

Evaluating KIND, LARABAR, and its own existing CLIF MOJO packaging, Clif

Bar concluded that KIND had the advantage in terms of meeting consumer demand

for transparent packaging, visible product, and clear nutrition claims (A556).  Clif

Bar did not, however, mimic KIND's packaging.[1]  Throughout the design process,

Clif Bar employees emphasized their desire to employ strong CLIF and MOJO

branding, to communicate "who we are," to differentiate the new CLIF MOJO

packaging from KIND's packaging, and to compete fairly by making a better-

tasting product than KIND with organic ingredients and a fair price (A558, A565,

A713-16, A536 l.15-551 l.24, A667 l.6-A670 l.20, A677 l.24-A679 l.22).

---

[1] Kim Dao, Clif Bar's MOJO brand manager, testified that when Clif Bar felt its
use of a large color block on its caddies brought the design "too close to KIND,"
that element **was omitted** before the final design for the new MOJO caddy was
approved (A568-69 ¶¶ 4-5, A542 l.21-A543 l.10).  Other contemporaneous
documents reveal that Clif Bar took steps "to further differentiate [its new
packaging] from KIND" (A558; A549 ll.17-25).

KIND points to a single document stating that Clif Bar sought to achieve a "similar window shape and coloring to KIND" (A564). Yet Ms. Dao, the author of the document, testified that while Clif Bar's intent was to adopt a broad transparent panel similar to KIND's revealing the premium bar inside (A532 ll.16-25), the word "coloring" referred to the clarity of the transparent window, not the printed matter on the packaging (A536 l.15-A537 l.7).

KIND's Trademark Registrations

KIND owns trademark registrations for the KIND trademark and the KIND logo, among many other registrations (A86-87, A91), as well as two registrations for its packaging trade dress shown below:



Reg. No. 3,882,221 (A943)          Reg. No. 4,097,493 (A201)

These registrations show the key elements of the KIND wrapper that KIND considered source identifiers before it filed this action. Both prominently feature the KIND mark and logo on the right side of the mark and a graphic design comprised entirely of rectangles and squares of various dimensions. The black and white registration (A201) expressly disclaims "FRUIT+NUT and the non-distinctive packaging configuration" and also excludes matter that is not part of the mark by depicting it in broken lines. The color registration (A943), which does not

include the product descriptor FRUIT+NUT, expressly states that the transparent area or background is **not** part of the mark, and excludes other matter by depicting it in broken lines.[2]  As summarized in the charts received in evidence (A1147-48), the CLIF MOJO trade dress does not include any of the trade dress elements KIND identified in the descriptions of its federally registered marks.

KIND owns no trademark registration for the product configuration of its KIND bar, which, like most snack bars, is a simple rectangular bar, and, like most whole ingredient snack bars, contains ingredients you can see (A17 ll.2-13; A50 ll.23-25; A844-92; A900-02).

KIND's Concessions

KIND has conceded that essentially all of the individual elements that comprise its alleged trade dress are functional, generic or otherwise unprotectable and unobjectionable:

---

[2] When prosecuting its color trade dress registration (A943), KIND unsuccessfully tried to strip out its most obvious source identifiers and claim protection for just the five colored bars in its logo, with the remaining elements of the wrapper included merely to show placement (A835).  The U.S. Patent and Trademark Office ("PTO") rejected this attempt, and instead required KIND to "also claim the word KIND, the bar behind it, and the colors therein, **as these are distinctive elements of the mark**" (*id.*, emphasis added).  The PTO considered KIND's overall wrapper design distinctive only insofar as it included, *inter alia*, "the word KIND in white on a horizontal black bar beneath a four-color panel consisting of the colors yellow, red, green and blue" (A943).

- "KIND agrees that transparency is a 'functional element' in snack bar packaging"; "[Y]ou can see the product you're going to eat.  You can see the wholesomeness of it.  You can see the ingredients.  You know how healthy this is and how yummy it looks" (DE61 at 7; A1049 ll.7-11; *see also* A50 ll.20-25, A105 ll.10-18).

- "We don't think we have a monopoly over transparent wrappers or over making whole nut and fruit bars" (A110 ll.22-23); "There's scores of companies that ma[k]e fruit nut bars" (A44 l.12).  *See also* A69 ll.19-20, A1048 ll.15-18, A1054 ll.11-13 ("fruit and nut" is generic); A943 (KIND trade dress registration disclaiming "FRUIT + NUT").

- Opaque end caps serve functional purposes "to shield dead space and to create a more pleasant appearance of the product for consumers" (A698 l.25-A699 l.5).

- The flow wrapping machinery that seals the end caps often "has a serrated edge.  The purpose of the serrated edge is to make laminated film packaging easier to open for the consumers which can otherwise be difficult" (A700 ll.16-23).

- KIND's flavor names are just a recital of the key ingredients in the bars: "For example, this bar is called pomegranate blueberry pistachio because it has pomegranate, blueberries and pistachios" (A150 l.2-A151 l.2; *see also* A69 ll.20-21).

14

- "[W]e have in the past certainly allowed others to sell a 40-gram bar, we don't object to that" (A20 ll.22-24; A1052 ll.1-2).

- "They . . . want to list the benefits on the front of the package. We're fine with that" (A1069 ll.1-3; A20 ll.24-25).

FDA Labeling Requirements

FDA regulations specifically require that the principal display panel of the parties' packages bear the common name of the food or an appropriately descriptive term (or, when the nature of the food is obvious, a fanciful name commonly used by the public for the food) in bold type, in a size reasonably related to the most prominent matter on the panel, and in lines generally parallel to the base. 21 C.F.R. § 101.3. The common name of the food must also include any characterizing ingredients. *Id.* On a transparent film wrapper, displaying a line of text against an opaque background such as a bar or a banner makes it more legible and prominent (A699 l.16-A700 l.6; A1146).

The FDA recommended serving size for grain-based bars (the closest analog to the bars at issue) is 40 grams. 21 C.F.R. § 101.12.

Colloquy with Court

During the testimony of KIND's CEO Mr. Lubetzky on the first day of the hearing, the District Court asked whether he had any data to support his impression that an appreciable number of consumers are exposed to the KIND packaging with

15

the KIND name and logo covered up, and he promised to provide it (A156 l.2 – A162 l.18). At the close of the third day of the hearing, before KIND put Mr. Lubetzky back on the stand to answer that and other questions from the bench, the District Court provided KIND with further guidance as to the issues on which its evidence was most lacking (A705 l.442 – A707 l.11). In the course of that colloquy, the District Court stated: "I already accepted the distinctiveness of the [KIND] packaging" but "[a]t this point, I would be likely to find for defendant. To me, the dominance of the trade dress of Mojo and Clif suggests to me a difference en prov[en]ance, a strong difference, and that's based in part on the very credible testimony from Mr. Lubetzky of how distinctive and minimalist the KIND trade dress is" (A706 l.13-A707 l.3). KIND's counsel expressed his hope that "your Honor will keep an open mind," to which Judge Wood replied, "My mind is porously open" (A707 ll.9-11).

In its rebuttal case, KIND failed to adduce any hard data to show that an appreciable number of consumers have been exposed to the KIND packaging without the KIND mark and logo (A985 l.10-A987 l.11). In its post-hearing briefs (DE 61, 73) and initial summation (A1030), KIND similarly failed to answer the District Court's questions.

In contrast, Clif Bar continued to highlight KIND's failure to prove that the KIND packaging, without the KIND mark and logo, is recognized by consumers as

a source identifier  (*e.g.,* DE72 at 1-11; A1117 l.10-A1153).  KIND had a full and fair opportunity to respond, and did so in its rebuttal summation (A1073 l.8 – A1080 l.13).  Having kept a "porously open mind," the District Court issued an opinion accepting Clif Bar's arguments that the six elements articulated by KIND as its common law trade dress, "either individually or together, do not serve to identify the source of the bar" and emphasized that "the only element of KIND's packaging that indicates its source, the KIND logo, is not included in the trade dress KIND seeks to protect here" (SPA5, citation omitted).

Confusion Evidence

KIND presented a survey by its expert George Mantis.  Clif Bar offered both a critique of that survey and an independent survey by its expert Dr. Michael Rappeport.  As the District Court noted, "Dr. Rappeport credibly testified that the Mantis survey was flawed because it measured whether there was confusion, but not what caused the confusion" (SPA15).  Specifically, Dr. Rappeport testified that Mr. Mantis's research failed to support his conclusion that 15% of consumers believe the new CLIF MOJO bars are made by the same company as KIND bars because of similarities in protectable trade dress, rather than one or more unprotectable elements of the parties' packaging, such as the transparent windows and the generic product and flavor descriptors (A574-84).

Dr. Rappeport performed his own survey, identical to KIND's survey except he used as controls third-party fruit and nut bars with see-through packaging (A579-80).[3] Dr. Rappeport's study demonstrated that transparent packaging—which KIND concedes is functional—is largely responsible for the skewed results in KIND's survey (A583).

Balance of Hardships

Clif Bar's CEO Kevin Cleary testified as to the substantial harm Clif Bar would suffer if its product launch were enjoined (A636 l.16, A679 l.23 – A680 l.16). Specifically, Clif Bar has sunk costs of approximately $13.9 million, including products in inventory and already shipped, contractual ingredient and marketing commitments, investment in store displays, and forecasted lost sales of other Clif Bar products that were discontinued to make room for the new product (A636 l.8 – A637 l.16, A738 ¶ 55). It would take Clif Bar approximately eight months to relaunch in new packaging, during which it would lose an additional $10 million or more in revenue (A636 ll.8-23; A738 ¶ 57). Clif Bar would also suffer

---

[3] Dr. Rappeport used as controls TRUE BAR and THINK THIN fruit and nut bars to eliminate "survey noise," or the percentage of respondents who provide a "same company" response for reasons unrelated to confusion caused by trade dress. Notably, the THINK THIN control bar generated the same percentage of "same company" responses as did the CLIF MOJO bar (A582-83). The TRUE BAR generated a somewhat lower number of "same company" responses, yielding a 9% net confusion rate (*id.*). Averaging the results of the two controls, the net confusion rate is less than 5% (A583).

unquantifiable reputational harm due to its inability to fulfill commitments to the trade and consumers, and would lose forever its window of opportunity to develop brand loyalty and the positive momentum generated by its launch (A68 ll.9-16; A738-39).

## STANDARD OF REVIEW

The United States Supreme Court has stated that the proper standard of review on a preliminary injunction motion is abuse of discretion. *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 664 (2004). Noting that the preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies," this Court has confirmed that the district court "has wide discretion in determining whether to grant a preliminary injunction, and this Court reviews the district court's determination **only** for abuse of discretion." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (emphasis added); *accord VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 185 (2d Cir. 2010).

As KIND notes, this Court reviews the legal conclusions underlying the District Court's decision on a preliminary injunction motion under a *de novo* standard—as indeed it reviews all issues of law. *See, e.g., City of N.Y. v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 120 (2d Cir. 2010); *Am. Express Fin. Advisors, Inc. v. Thorley*, 147 F.3d 229, 231 (2d Cir. 1998). It does not, however, follow that "where, as here, the basis of appeal is that the district court ruled on the

19

basis of erroneous legal conclusions, the **effective** standard of review is *de novo*"

(KIND Br. 16, emphasis original). To the contrary, the case law is clear that most

of the issues raised by KIND on this appeal are questions of fact reviewed under a

clearly erroneous standard. *See, e.g., Fun-Damental Too, Ltd. v. Gemmy Indus.

Corp*., 111 F.3d 993, 1001-02 (2d Cir. 1997) (functionality, distinctiveness);

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1043 (2d Cir.

1992) (secondary meaning, individual *Polaroid* factors); *Havana Club Holding,

S.A. v. Galleon S.A.*, 203 F.3d 116, 131 (2d Cir. 2000) (weight of evidence,

including surveys); *Johnson & Johnson * Merck Consumer Pharm. Co. v.

SmithKline Beecham Corp.*, 960 F.2d 294, 300-01 (2d Cir. 1992) (evaluation of

survey).

  In any event, under 28 U.S.C. § 2111, an appellate court "shall give

judgment after an examination of the record without regard to errors or defects

which do not affect the substantial rights of the parties." Under the harmless error

rule, in reviewing a district court's action for abuse of discretion, this Court can

affirm on any ground supported by the record. *See Grand River Enter.*, 481 F.3d at

66.

## ARGUMENT

I. **THE DISTRICT COURT CORRECTLY CONCLUDED THAT KIND FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS COMMON LAW TRADE DRESS INFRINGEMENT CLAIM UNDER SECTION 43(a) OF THE LANHAM ACT**

In *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000),

the Supreme Court demystified common law trade dress claims under Section

43(a) of the Lanham Act:

> The text of § 43(a) . . . require[s] that a producer show
> that the allegedly infringing feature is not "functional,"
> *see* § 43(a)(3), and is likely to cause confusion with the
> product for which protection is sought, *see* § 43(a)(1)(A)
> . . . . Nothing in § 43(a) explicitly requires a producer to
> show that its trade dress is distinctive, but courts have
> universally imposed that requirement, since without
> distinctiveness the trade dress would not "cause
> confusion . . . as to the origin, sponsorship, or approval
> of [the] goods," as the section requires. Distinctiveness
> is, moreover, an explicit prerequisite for registration of
> trade dress under § 2, and "the general principles
> qualifying a mark for registration under § 2 of the
> Lanham Act are for the most part applicable in
> determining whether an unregistered mark is entitled to
> protection under § 43(a)." *Two Pesos, Inc. v. Taco
> Cabana, Inc*., 505 U. S. 763, 768 (1992) (citations
> omitted).

The following year, in *Traffix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S.

23, 30 (2001), the Supreme Court characterized the 1999 amendment adding

Section 43(a)(3) as a "statutory presumption that features are deemed functional

until proved otherwise by the party seeking trade dress protection."

Accordingly, KIND must plead and prove three basic elements to support its

trade dress infringement claim:

> (1) plaintiff owns a protectable trade dress in a clearly articulated design or combination of elements that is either inherently distinctive or has acquired distinctiveness through secondary meaning.
> (2) the accused mark or trade dress creates a likelihood of confusion as to source, or as to sponsorship, affiliation or connection.
> (3) if the trade dress is not registered, the plaintiff must prove that the trade dress is not functional.

1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 8:1

(4th ed. 2014) ("McCarthy"); *accord Bristol-Myers*, 973 F.2d at 1039. The

District Court did not clearly err in finding that KIND failed to do so.

## A. The District Court Properly Adopted KIND's Own Articulation Of Its Unregistered Trade Dress

KIND moved for a preliminary injunction solely on its first claim for

unregistered trade dress infringement under Section 43(a) (DE2, DE9 at 5). A

plaintiff asserting a trade dress claim under Section 43(a) must articulate with

specificity what "word, term, name, symbol, or device, or . . . combination thereof"

it seeks to protect. *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 118 (2d Cir.

2001); *Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 381 (2d

Cir. 1997); McCarthy § 8:1. This pleading requirement is necessary because a

plaintiff is free to claim protection for one, some, or the totality of features

appearing on a package or container.[4]   McCarthy § 8:1; *see also* 15 U.S.C. § 1127

(definition of trademark:  "**any word, name, symbol, or device, or any**

**combination thereof** . . . used by a person . . . to identify and distinguish his or her

goods . . . from those manufactured or sold by others and to indicate the source of

the goods") (emphasis added).  Unless the plaintiff provides fair notice of which

features it seeks to protect, the court and defendant cannot evaluate the

protectability and strength of the plaintiff's claimed trade dress, its similarity to the

defendant's trade dress, affirmative defenses such as fair use, or the appropriate

scope of injunctive relief.  *See, e.g., Yurman Design*, 262 F.3d at 116; *Landscape*

*Forms*, 113 F.3d at 381.

KIND argues that this specificity requirement applies only to product trade

dress claims (KIND Br. 22-27), but cites no case so holding.[5]  Courts and

---

[4] "While trade dress is most often defined as a totality of elements, there is no reason why the plaintiff cannot define a list of elements consisting of less than the totality of features appearing on a package or container." McCarthy § 8:1 *citing, inter alia, Hershey Foods Corp. v. Mars, Inc.*, 998 F. Supp. 500, 517-518 (M.D. Pa. 1998).  For example, the wax seal on a bottle of bourbon or the color of a Tiffany box are devices that have been recognized as source identifiers in themselves, without the other elements of the product packaging.  *See Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 420 (6th Cir. 2012); U.S. Trademark Reg. No. 2,359,351, *available at* http://tmsearch.uspto.gov/.

[5] KIND argues that a plaintiff asserting a Section 43(a) claim based upon packaging trade dress is not required to articulate the specific trade dress elements on which it sues because this Court did not address the specificity requirement in *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 997 (2d Cir. 1997) and *Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 581, 584 (2d

23

commentators draw no such distinction. For example, in *Kaufman & Fisher Wish Co. v. F.A.O. Schwarz*, 184 F. Supp. 2d 311, 316-17 (S.D.N.Y. 2001), *as amended* (Oct. 22, 2001), *aff'd*, 51 F. App'x 335 (2d Cir. 2002), Judge Lynch held the rule applicable to both product and packaging design trade dress claims:

> While the Lanham Act protects the "overall image or appearance" created by a product's design or packaging, the plaintiff must precisely articulate the specific elements that comprise its distinct trade dress, so that courts properly may evaluate claims of infringement and fashion relief that is appropriately tailored to the distinctive combination of elements that merit protection. *See Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 381 (2d Cir. 1997) (plaintiffs must provide "a precise expression of the character and scope of the claimed trade dress"). This articulation requirement also helps to ensure that claims of trade dress infringement are pitched at an appropriate level of generality, for "just as copyright law does not protect ideas but only their concrete expression, neither does trade dress law protect an idea, a concept, or a generalized type of appearance." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 32 (2d Cir.1995); *see Landscape Forms,* 113 F.3d at 381.

*See also, e.g.*, *Medisim Ltd. v. BestMed LLC*, 910 F. Supp. 2d 591, 605 (S.D.N.Y. 2012) (rule applied to both product and packaging trade dress); *Funrise Canada*

---

Cir. 1993) (KIND Br. 25-26). The more obvious conclusion is that the specificity requirement was not at issue on those appeals. In fact, a review of the complaint in *Paddington* confirms that the plaintiff **did** plead its trade dress with specificity in ¶ 17. While Clif Bar could not obtain a copy of the complaint in *Fun-Damental Too* from court archives or counsel of record prior to filing this brief, the plaintiff's appellate brief, available at 1996 WL 33415578, similarly articulated its packaging trade dress elements with specificity at pp. *12-13.

*(HK) Ltd. v. Zauder Bros., Inc.*, 1999 WL 1021810, at *15 n.19 (E.D.N.Y. July 2, 1999) (same).

KIND's experienced counsel is well aware of this requirement. Thus, in its Complaint (DE2 ¶ 14), moving brief (DE9 at 8) and supporting declaration of KIND's CEO Daniel Lubetzky (A203 ¶ 3), KIND precisely defined its trade dress by articulating the combination of six specific elements quoted at p. 3 above. KIND's consumer survey expert testified that he was aware "that KIND had defined its common law trade dress in the case as a distinctive trade dress that includes six elements" and his survey design assessed the influence of that six-element trade dress (A172 l.6-A173 l.4, A186 ll.22-25). In his final summation, KIND's counsel reiterated, "We have identified the six key elements. . . . These elements are the totality of our trade dress that we have always been acting on" (A1074 ll.17-20).

KIND now asserts that it "sought to protect as a trade dress the overall look of its packaging," citing as support the following statement in its pre-hearing reply brief: "This case is about the overall look of KIND's trade dress, not any individual element" (KIND Br. 16, citing DE40 at 1). KIND made that statement in the context of arguing that "it is improper for a defendant to break a plaintiff's trade dress down into specific elements and call them functional where the plaintiffs' claim is that the combination and arrangement of those design elements

25

comprise the trade dress at issue" (DE40 at 1). KIND elsewhere noted in that same brief that the specific elements of the unregistered trade dress at issue are not the same elements covered by its federal trade dress registrations (*id*. at 4, n.1). In other words, KIND was seeking to protect the "overall look" of the six elements it has consistently identified as its unregistered trade dress, rather than the "overall look" of its federally registered trade dress or its packaging as a whole, which include, *inter alia*, the KIND mark and logo.

During the hearing, KIND's CEO repeatedly suggested that just a transparent rectangle bisected by a black bar signifies KIND as the source of a healthy snack bar (A44 ll.7-10, A141 ll.19-20, A955 ll.19-24, A962 ll.5-7, ll.19-21), but failed to substantiate that contention through the proof the District Court specifically requested (A158 l.4-A161 l.4). In its post-hearing reply brief, KIND went so far as to say that "any confusion caused by the transparent element of the MOJO trade dress is actionable" (DE73 at 8). It became increasingly obvious that KIND was trying to protect the transparent element of its wrapper *per se*, which is not protectable as a matter of law (*see* Point I.B.1, *infra*).

The District Court rejected KIND's tactics. As this Court explained in *Landscape Forms*, which the District Court applied and quoted at length (SPA2 at 2 n.1, 11):

> [T]here is no question that trade dress may protect the "overall look" of a product . . . . **Nonetheless, focus on**

26

> **the overall look of a product does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress**. Without such a precise expression of the character and scope of the claimed trade dress, litigation will be difficult, as courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market. Courts will also be unable to shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves protection. Moreover, a plaintiff's inability to explain to a court exactly which aspects of its product design(s) merit protection may indicate that its claim is pitched at an improper level of generality, i.e., the claimant seeks protection for an unprotectable style, theme or idea.

113 F.3d at 381 (quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995)) (citation omitted; emphasis added).

In sum, the law is clear that a plaintiff asserting a trade dress claim under Section 43(a) must articulate the specific elements comprising its distinct dress. And whether or not it was required to do so, KIND **did** articulate the combination of six specific "ingredients" comprising its claimed trade dress. The District Court did not err, or abuse its discretion, by applying KIND's own articulation of its trade dress.

### B. Packaging Trade Dress Is Not Ipso Facto Distinctive

This case underscores precisely why it is so important to require plaintiffs asserting trade dress claims to plead the elements of that dress with particularity: many of the elements of KIND's claimed trade dress are not protectable as a matter

of law.

### 1. KIND's Basic Product and Packaging Configurations Are Not Protectable

The District Court found that KIND's articulated trade dress was not distinctive because, *inter alia*, many of its elements serve functional purposes (SPA5). There is no clear error in that finding. Functional packaging and product features are never protectable as trade dress under Section 43(a). *Jeffrey Milstein,* 58 F.3d at 31; *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 75-76 (2d Cir. 1985).

It is black letter law that see-through packaging "is functional and free for all to use." McCarthy, § 7:87.[6] Accordingly, before it would register the black and

---

[6] *See, e.g.*, *Malaco Leaf AB v. Promotion in Motion, Inc.*, 287 F. Supp. 2d 355, 366 (S.D.N.Y. 2003) (cellophane Swedish Fish packaging with a clear window on the front was functional and "free for all to use"); *Original Appalachian Artworks, Inc. v. Blue Box Factory (USA), Ltd.*, 577 F. Supp. 625, 631 (S.D.N.Y. 1983) ("The plastic front window on the boxes in which the dolls are sold is a commonly used, functional device"); *Dixie Vortex Co. v. Lily-Tulip Cup Corp,*, 19 F. Supp. 511, 522 (E.D.N.Y. 1937) ("It is doubtful whether [plaintiff] was the first to use cellophane as a wrapping, but certainly it was not distinctive with that company."); *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 874 (8th Cir. 1994) ("There can be no doubt that the cellophane bag is functional . . . , especially where a product is sold in part on the basis of its aesthetic appeal."); *Power Controls Corp. v. Hybrinetics, Inc.*, 806 F.2d 234, 239 (Fed. Cir. 1986) (plastic "clam shell" packaging is functional; "[t]he package was made clear so that the product could be viewed by the consumer"); *Germanow v. Standard Unbreakable Watch Crystals, Inc.*, 283 N.Y. 1, 11 (1940) ("The use of glassine or transparent paper to display the contents of a package was a functional expedient not adapted to indicate the source of manufacture . . . .").

white version of KIND's trade dress, the PTO required KIND to disclaim "the

nondistinctive packaging configuration" (A201; A1148).  And KIND itself

concedes that both its product configuration (a rectangular bar) and basic

packaging configuration (transparent film packaging with serrated opaque end

caps) are functional (A20 l.20-A21 l.3; A50 ll.19-25; A69 ll.19-20; A105 ll.10-17;

A698 l.19-A700 l.23; A1049 ll.7-9; A1145).

The functionality doctrine prevents monopolization of advances in

functional design and encourages competition and broad dissemination of useful

design features.  *Jeffrey Milstein,* 58 F.3d at 31, citing *LeSportsac*, 754 F.2d  at 75-

76.  Here, KIND's basic product and packaging configurations are both free for all

to use.  As the Supreme Court long ago explained in *Kellogg Co. v. Nat'l Biscuit

Co.*, 305 U.S. 111, 121, 122 (1938):  "Where an article may be manufactured by

all, a particular manufacturer can no more assert exclusive rights in a form in

which the public has become accustomed to see the article . . . than it can in the

case of a name with similar connections in the public mind.  . . .  Sharing in the

goodwill of an article unprotected by patent or trademark is the exercise of a right

possessed by all and in the free exercise of which the consuming public is deeply

interested."

No amount of inherent distinctiveness or secondary meaning can transform

functional packaging or product features into trademarks.  *Nora Beverages, Inc. v.*

*Perrier Grp. of Am., Inc.*, 269 F.3d 114, 120 n.4 (2d Cir. 2001), citing *Traffix Devices*, 532 U.S. at 34-35; *see also* 15 U.S.C. § 1052(e)(5); *Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159 (1995); TMEP § 1202.02(c)(i)(A).[7]

### 2.    Generic Words and Devices Are Not Protectable

By the same token, if  KIND were seeking to protect just generic words or devices on its packaging, it could not state a claim under Section 43(a) as a matter of law.  In *Abercrombie & Fitch Co. v. Hunting World, Inc*., 537 F.2d 4, 11 (2d Cir. 1976),  Judge Friendly set forth the now-familiar spectrum of trademark distinctiveness in the context of word marks:  generic terms, which are never protectable; descriptive terms, which may be protectable upon a showing that they have acquired distinctiveness as a source identifier (often called "secondary meaning"); and suggestive, arbitrary, and fanciful marks, which are considered inherently distinctive without a showing of secondary meaning.[8]

---

[7] To the extent that KIND pioneered whole fruit and nut bars in transparent packaging in the U.S. and has the largest market share as it claims (A1023 ll.12-14), it is possible that consumers associate all such bars in such packaging with KIND. This type of association is sometimes described as "de facto secondary meaning," which does not give rise to enforceable trademark rights because no one can prevent competitors from employing functional designs.  *See*, *e.g.,* McCarthy § 7:66; *Reese Publ'g Co. v. Hampton Int'l Commc'ns, Inc.*, 620 F.2d 7, 12 n.2 (2d Cir. 1980).

[8] Notably, under the fair use doctrine, even if a descriptive term or symbol has acquired secondary meaning identifying a single source, that source cannot prevent later comers from using the same words or symbols comprising the mark in their descriptive sense.  15 U.S.C. § 1115(b)(4); *Car-Freshener Corp. v. S.C. Johnson &*

No one can monopolize a generic term or trade dress feature, and if such matter is contained within a composite mark, the generic matter is not registrable. *See* 15 U.S.C. § 1056; TMEP § 1213.03(b); *see also Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 148 n.11 (2d Cir. 1997). "This rule protects the interest of the consuming public in understanding the nature of goods offered for sale, as well as a fair marketplace among competitors by insuring that every provider may refer to his goods as what they are." *Otokoyama Co., Ltd. v. Wine of Japan Imp., Inc.*, 175 F.3d 266, 270 (2d Cir. 1999).

KIND concedes that the phrase "Fruit & Nut" and its straightforward flavor names listing ingredients are generic. FDA regulations require their use in a prominent statement of identity generally parallel to the base of the product. 21 C.F.R. §§ 101.3, 101.4. Placing a bar or banner behind the required statement of identity on a see-through wrapper makes it easier to read and thus more prominent. While KIND argues that transparent packaging is functional, not generic, Clif Bar submits it is both: transparent packaging has been commonplace in the food industry generally (and the health and snack food segments specifically) for well over half a century, and this generic type of packaging has been enthusiastically embraced by over thirty manufacturers to showcase their healthy snack bars.

---

*Son, Inc.*, 70 F.3d 267, 269-70 (2d Cir. 1995) ("[T]he public's right to use descriptive words or images in good faith in their ordinary descriptive sense must prevail over the exclusivity claims of the trademark owner.").

"No one competitor should have the exclusive right to show a picture of a functional product. This would be the competitive equivalent of an exclusive right to the generic name of the product, which no one can own." McCarthy § 7:37, *cited with approval in Ga.-Pac. Consumer Prods. LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 732 (7th Cir. 2011). For the same reason, no one should have the exclusive right to show a generic rectangular snack bar through a generic film wrapper.

### 3.    KIND Cannot Protect An Idea, Concept or Generalized Type of Appearance

"[J]ust as copyright law does not protect ideas but only their concrete expression, neither does trade dress law protect an idea, a concept, or a generalized type of appearance." *Jeffrey Milstein*, 58 F.3d at 33-34. This is yet another reason why unregistered trade dress must be pleaded with particularity. During the hearing, KIND's CEO took the position that KIND can prevent others from using not only the specific combination and arrangement of six elements it articulated as its trade dress, but also "mirror images" of that arrangement and selected portions of it (as Mr. Lubetzky demonstrated in court when he covered the branding on a KIND bar) (A124 ll.2-3, A158 ll.4-24). Mr. Lubetzky evidently believes that the three very different packages shown below infringe or "arguably" infringe KIND's

32

trade dress rights:

 



(A227-28 ¶ 16, A63 l.11-A65 l.19; A141 l.3-A.142 l.1; A384-85; A850-53;

SPA11.)

KIND is not claiming trade dress protection for a unique configuration of

specified elements, but essentially any configuration of any of the elements of its

wrapper.  As the District Court indicated, KIND's "claim is pitched at an improper

level of generality" because so many snack bars employ at least some of the same

elements KIND seeks to protect (SPA11).  To grant KIND trade dress protection

for the amorphous "overall look of its packaging" would be tantamount to granting

it "protection for an unprotectable style, theme or idea." *Landscape Forms* 113

F.3d at 379-80.  Which of KIND's functional and generic packaging elements are

Clif Bar and others free to use?  And in what arrangement or configuration?

### 4.    There Is No Presumption That Packaging Trade Dress Is Distinctive

There is, of course, no presumption that unregistered packaging trade dress

is inherently distinctive.  In *Fun-Damental Too,* 111 F.3d at 1000, on which KIND

33

heavily relies, this Court stated: "[D]espite the broad opportunity to design an arbitrary or fanciful trade dress, a specific trade dress must still be evaluated to determine whether it is so distinctive as to point to a single source of origin and thereby be entitled to Lanham Act protection." In case after case, courts have found that the packaging at issue failed that test.[9]

Further, while there is certainly a distinction between product and packaging trade dress, that distinction evaporates where, as here, the packaging is a transparent wrapper displaying the product within. In *Wal-Mart,* 529 U.S. at 213, the Supreme Court elaborated on the strong federal policy in favor of vigorous competition and held that the presumption of inherent distinctiveness for suggestive, arbitrary and fanciful marks under *Abercrombie* cannot be applied in product configuration cases: "Consumers should not be deprived of the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves by a rule of law that facilitates plausible threats of suit against new entrants based upon alleged inherent distinctiveness." Noting that the line between product and packaging trade dress is not always obvious, the Supreme Court concluded, "To the extent there are close cases, we believe that courts should

---

[9] *See, e.g., Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc*., 65 F.3d 1063, 1070 (2d Cir. 1995); *Kaufman & Fisher Wish Co.*, 184 F. Supp. 2d at 322; *Regal Jewelry Co. v. Kingsbridge Int'l, Inc.,* 999 F. Supp. 477, 489 (S.D.N.Y. 1998).

err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning." *Id.* at 215.

Anticipating this aspect of the Supreme Court's decision in *Wal-Mart*, this Court observed in *Landscape Forms,* 113 F.3d at 379-80, that "application of these principles [concerning use of the *Abercrombie* spectrum in trade dress cases] will also be complicated by the fact that it may at times be difficult to say exactly where a product stops and its packaging begins." This Court concluded, "Whether or not the *Abercrombie* analysis is employed, the Lanham Act must be construed in the light of a strong federal policy in favor of vigorously competitive markets"; this necessitates due deference to the functionality doctrine, which "protects competition even at the cost of potential consumer confusion." *Id.* at 378, *citing, inter alia, Kellogg*, 305 U.S. at 122. *Wal-Mart* and *Landscape Forms* post-date this Court's decision in *Fun-Damental Too* (KIND Br. 25-26), and reflect a heightened sensitivity to the dangers of applying a presumption of inherent distinctiveness in borderline cases.

Packaging trade dress cases involving see-through packaging exemplify the gray area where it is "difficult to say exactly where a product stops and its packaging begins." *Landscape Forms*, 113 F.3d at 379-80. Following *Wal-Mart,* the court in *Luv N' Care, Ltd. v. Walgreen Co.*, 695 F. Supp. 2d 125, 134 (S.D.N.Y. 2010), properly required the plaintiff to prove secondary meaning for its

35

claimed trade dress for "sippy cups" where the "alleged packaging is nothing more than clear shrink-wrap with text that becomes the shape of the bottle . . . and therefore merges with the product design itself."  Similarly,  KIND's rectangular whole fruit and nut bar (which looks like many other makers' bars) is clearly visible through its rectangular film wrapper and becomes the field for the packaging text and graphics.  This merger of product and package provides an alternate ground for the District Court's holding that KIND must prove secondary meaning, as does the fact that the squares, rectangles and bars used in the minimalist graphic design of KIND's wrapper are "fundamental communicative devices essential to the dissemination of information to consumers." *Star Indus., Inc. v. Bacardi & Co. Ltd.,* 412 F.3d 373, 382, 383 (2d Cir. 2005) ("Common basic shapes or letters are, as a matter of law, not inherently distinctive.").[10]

---

[10] *See also, e.g.*, *Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 454 F.3d 108, 116 (2d Cir. 2006) ("Basic geometric shapes, basic letters, and single colors are not protectable as inherently distinctive."); *P.F. Cosmetique S.A, v. Minnetonka, Inc.,* 605 F. Supp. 662, 668 (S.D.N.Y. 1985) (trade dress is "weak" when it contains "[c]lean pale colors, strong horizontal bands, and enclosed depictions of plants [that] are commonly utilized in varying combinations "); TMEP § 1202.11 ("Common geometric shapes and background designs that are not sufficiently distinctive to create a commercial impression separate from the word and/or design marks with which they are used, are not regarded as indicators of origin absent evidence of distinctiveness of the design alone.").

**C.    The District Court Correctly Concluded That KIND Failed To Prove That Its Articulated Trade Dress Functions As A Source Identifier**

The District Court did not commit clear error in finding that KIND's purported trade dress lacks secondary meaning.  Secondary meaning is a question of fact that "entails vigorous evidentiary requirements," *Bristol-Myers*, 973 F.2d at 1041; *20th Century Wear, Inc. v. Sanmark-Stardust, Inc.*, 815 F.2d 8, 10 (2d Cir. 1987), not statements of personal opinion by interested parties.  "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the **primary significance** of a product feature or term is to identify the source of the product rather than the product itself."  *Bristol-Myers*, 973 F.2d at 1041 (citation omitted; emphasis added).

The District Court accurately observed that "KIND fails to establish that its sales, marketing and advertising expenditures, and unsolicited media coverage have resulted in consumers associating the six elements it seeks to protect as its trade dress with KIND.  The trade dress KIND seeks to protect here excludes its logo, and KIND has not shown that its packaging, without the logo, has acquired secondary meaning" (SPA8, citing *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 168 (2d Cir. 1991)).

For the same reason, neither "[p]roof of an expensive and successful advertising campaign," *Mattel, Inc. v. Azrak-Hamway, Int'l, Inc.*, 724 F.2d 357,

361 n.2 (2d Cir. 1983), nor "proof of a product's popularity" establish that the combination of features KIND seeks to protect has acquired secondary meaning. *20th Century Wear, Inc. v. Sanmark-Stardust, Inc.*, 747 F.2d 81, 90 n.9 (2d Cir. 1984); *accord Jeffrey Milstein*, 58 F.3d at 34 (denying preliminary injunction where plaintiff presented media coverage discussing its greeting cards but "provided no consumer survey or other evidence suggesting that its trade dress identified the source of the product").

KIND argues that Clif Bar "mimics" KIND's trade dress (KIND Br. 10), but as the record makes clear, Clif Bar only used unprotectable elements of KIND's packaging and otherwise conscientiously differentiated its packaging from KIND's. Further, as the District Court recognized, "conscious replication alone does not establish secondary meaning" (SPA9, citing *Coach Leatherware*, 933 F.2d at 169), and KIND failed to "demonstrate that Clif Bar adopted its new MOJO trade dress with the intent to deceive consumers into believing the MOJO bar was made or sponsored by KIND" (SPA20). Notably, KIND has not proffered a consumer survey as to secondary meaning, which is the "most persuasive" and "only direct evidence of secondary meaning." *Metro Kane Imps., Ltd. v. Rowoco, Inc.*, 618 F. Supp. 273, 276 (S.D.N.Y. 1985), *aff'd,* 800 F.2d 1128 (2d Cir. 1986).

38

## II. THE DISTRICT COURT CORRECTLY CONCLUDED THAT KIND FAILED TO CARRY ITS BURDEN OF PROVING THAT THE ALLEGEDLY INFRINGING TRADE DRESS IS LIKELY TO CAUSE CONFUSION

The District Court did not "improperly conflate[] the question of the protectability of KIND's trade dress with the question of likelihood of confusion," as KIND contends (KIND Br. 30).

For purposes of analyzing the protectability of KIND's trade dress, the court below properly focused on the six-factor trade dress articulated by KIND in pleading its Section 43(a) claim. It did not address the protectability of the different combinations of elements covered by KIND's trade dress registrations because KIND did not move on its trademark infringement claim under Section 32(1), and it did not address the protectability of the packaging as a whole because that is yet another combination of elements, including all of the elements covered by KIND's registrations (and much more).

For purposes of analyzing likelihood of confusion, the District Court properly considered KIND's packaging as a whole along with other relevant marketplace factors under this Court's decision in *Nora Beverages*, 164 F.3d at 744 (SPA 12).

The District Court's findings on individual likelihood of confusion factors are subject to review for clear error. *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 105 (2d Cir. 2009). KIND concedes that likelihood of confusion

39

is "a heavily fact-based, multi-factor inquiry," but argues that legal errors "tainted" the District Court's analysis of three factors (KIND Br. 31). There were no legal errors, and there is ample evidentiary support for the District Court's factual findings.

### A. The District Court Properly Concluded That KIND's Alleged Trade Dress Is Weak

The record is replete with compelling evidence supporting the District Court's conclusion that KIND's trade dress is weak. KIND's basic packaging configuration—film wrappers with opaque, serrated end caps—and its product configuration—a slender rectangular bar with visible ingredients—are both functional and commonplace. The term FRUIT+NUT and KIND's flavor names are generic terms that describe the ingredients of its bars. FDA regulations require that the principal display panel of snack bars bear the common name in bold type and any characterizing ingredients of the food, in a size reasonably related to the most prominent matter on the panel, and in lines generally parallel to the base, and further establish that 40 grams is the customary serving size. 21 C.F.R. §§ 101.3, 101.4, 101.12. It is also customary for healthy snack bars to call out their health benefits on their wrappers.

The District Court did not err in finding that KIND's combination of these commonly used elements is conceptually weak. Even assuming arguendo that the combination and arrangement of such elements could be protected as trade dress,

40

the protection would be thin, limited to "the particular combination and arrangement of design elements that identify [KIND bars] and distinguish them from other" bars, to borrow the language of this Court's decision in *LeSportsac*, 754 F.2d at 76, on which KIND relies (KIND Br. 21-22). *See also Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 248-49 (S.D.N.Y. 1999) (KIND Br. 35) (trade dress is "weak" where "it consists of a combination of design elements used frequently throughout the . . . industry") (citations omitted); *Funrise Canada*, 1999 WL 1021810, at *16 (KIND Br. 34) (trade dress is "weak" where "many of the individual features comprising plaintiff's trade dress are common or generic").

   The District Court cited *Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113, 118 (2d Cir. 1999), for the unremarkable proposition that third-party use of the elements a plaintiff claims as trade dress weakens their potential to identify source in the marketplace (SPA10). As the District Court found, "many food bars use the elements KIND seeks to protect as its trade dress, either individually or by using some elements in combination" (*id*.). Based upon the lack of conceptual strength of the trade dress on the *Abercrombie* spectrum and the lack of commercial strength due to extensive third party use, the District Court correctly found "that the KIND trade dress is weak" (*id*.).

### B. The District Court Properly Concluded That The Parties' Packaging Is Not Confusingly Similar

In evaluating similarity, the District Court correctly focused on "whether the

two products 'create the same general overall impression'" (SPA12, *citing RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir. 1979)). Relying on its visual inspection of the parties' products in their packaging and the testimony of the parties' CEOs and Clif Bar's packaging consultant Robert Rosen, the District Court found that "although the two trade dresses share some similar elements, the overall impression of the KIND trade dress differs significantly from the MOJO trade dress" (SPA12-14). The District Court considered the overall graphic design, color scheme, fonts, and number and placement of design elements of the parties' packaging, and enumerated a long list of specific differences (*id.*).

One of **thirteen** specific differences identified by the District Court is the fact that "Clif Bar uses its registered design mark as a house mark, as well as its registered MOJO design mark; KIND uses the KIND design mark and no secondary mark" (SPA13, n.5). The District Court found that "the prominent use of the MOJO mark and the use of the Clif Bar mark . . . tends to dispel any confusion as to the origin or sponsorship of the product" (SPA15). This proposition is unassailable as a matter of common sense and experience; to differentiate between two packages of peanut butter cheese crackers, for example, a consumer would look at the branding on their transparent wrappers (A785, A944).

The District Court cited *Bristol-Myers,* 973 F.2d at 1046, among other cases,

in support of that factual finding. KIND argues this was an error of law because *Bristol-Myers* only applies to the prominent display of "well known" brand names (KIND Br. 33). The CLIF house mark has 87% aided awareness in its industry category (Tr. 388), so it is a well-known name for snack bars. In any event, *Bristol-Myers* holds that "markings tending to dispel confusion [are] highly relevant" and "[w]hen prominently displayed it can go far towards eliminating any possible confusion." 973 F.2d at 1046. Numerous cases have applied this rule in cases where one or both of the brand names are not well-known.[11]

Finally, while this Court has said that a plaintiff's trade dress "should not be dissected to prove similarity to or public confusion with" the defendant's trade dress, *Merriam Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 71 (2d Cir. 1994) (quotation marks and citation omitted), it certainly does not follow that courts may find a likelihood of confusion based upon shared features that are functional, generic and/or in common use. "For example, if the claimed trade dress is packaging composed of designs and motifs in common use by several competitors,

---

[11] *See, e.g.*, *Landscape Forms,* 113 F.3d at 382 (Columbia, Landscape); *Bose Corp. v. Linear Design Labs*, 467 F.2d 304, 309 (2d Cir. 1972) (Bose, LDL); *Luv n' Care, Ltd. v. Mayborn USA, Inc.*, 898 F. Supp. 2d 634, 648 (S.D.N.Y. 2012) (NUBY, defendant's "signature star" mark); *Winner Int'l LLC v. Omori Enterprises, Inc.*, 60 F. Supp. 2d 62, 68 (E.D.N.Y. 1999) (The Club, Global America); *Tough Traveler, Ltd. v. Outbound Prods.*, 989 F. Supp. 203, 213 (N.D.N.Y. 1997) (Tough Traveler, Outbound).

this is a factor arguing against a likelihood of confusion. Where the features shared by the conflicting trade dresses are unprotectable because functional, that dictates against a finding of likelihood of confusion." McCarthy § 8:15.

Accordingly, in *Merriam Webster*, 35 F.3d at 71, this Court rejected a claim of trade dress infringement notwithstanding the parties' use of red dust jackets, white lettering and the same generic terms as part of the overall trade dress of their respective dictionaries. It stated: "We are not dissecting the trade dress by comparing the similarity of individual elements . . . . Indeed, a finding of similarity of trade dress would rest solely on a dissection of individual elements, in particular the use of 'Webster's' and 'College.'"

In *Stormy Clime Ltd. v. ProGroup, Inc.*, 809 F.2d 971, 976 (2d Cir. 1987), this Court found that the common features of the rain jackets at issue were functional. "Though the rainjackets are similar in appearance," said the Court, "their purely ornamental features and labeling differ in almost every respect other than color, and Stormy Clime, having elected to manufacture its product in fourteen different colors, is not in a strong position to complain that a competitor's product uses a few of those same colors."[12]

_____

[12] KIND similarly employs a broad array of colors in its KIND logo and the colorful end caps differentiating its different flavors. Under the doctrine of aesthetic functionality, the black elements of the KIND wrapper could at most qualify for protection insofar as they contrast from the bold color blocks on the wrapper. *See Christian Louboutin SA v. Yves Saint Laurent Am. Holdings, Inc.*,

Similarly, in *Malaco Leaf*, 287 F. Supp. 2d at 373, Judge Pauley first considered the graphics on the packaging of the Swedish Fish candies at issue, found them dissimilar, and then categorically rejected the contention "that both packages are similar because they are composed of cellophane and have a clear window on the front of the package" because see-through packaging is free for all to use.

In short, similarities between functional and generic elements are insufficient to prove that the packaging at issue is confusingly similar. The District Court correctly focused on the overall look of the graphics, fonts, composition, branding, copy and use of color on the parties' otherwise unprotectable see-through wrappers; properly considered the fact that each party conspicuously brands its packaging with its own brand name and logo; and correctly concluded that the parties' respective packages are not confusingly similar. *See* A1145-46, A1149-50.

### C. The District Court Properly Concluded that KIND's Survey Failed to Show Actionable Confusion

The District Court did not clearly err in discounting the survey conducted by KIND's survey expert. The District Court found that the 15% net confusion levels found by Mr. Mantis were not impressive and "[i]n addition, Dr. Rappeport

---

696 F.3d 206, 227 (2d Cir. 2012) ("[I]t is the contrast between the sole and the upper that causes the sole to 'pop,' and to distinguish its creator.").

credibly testified that the Mantis survey was flawed because it measured whether there was confusion, but not what caused the confusion" (SPA17). Mr. Mantis chose as a control a modified version of an old opaque CLIF MOJO wrapper "designed to remove the six elements that plaintiff defines as its trade dress" (A177 ll.21-23). That control was basely inadequate either to filter out the impact of individual generic and functional elements, or to establish that the overall look of KIND's articulated trade dress caused the net confusion he reported (A186 l.8-A189 l.20).

In a misguided effort to avoid the clearly erroneous standard of review on this issue, *see J&J *Merck*, 960 F.2d at 300-01, KIND trumps up an alleged "legal issue which both sides' experts agreed was at the heart of the difference between them" (KIND Br. 36). KIND says that Clif Bar's counsel instructed Dr. Rappeport "to assume that transparency is a 'generic' element in snack bar packaging" and then argues that it is not (without citing any authority so holding) (KIND Br. 38-39). But Clif Bar's counsel did not so instruct Dr. Rappeport. Rather, as stated in his report, he was "informed that see-through wrapping is an element of the trade dress which by itself is legally acceptable and not subject to an infringement claim" (A578 ¶ 5; *see also* A462 ll.7-23). Even when KIND's counsel tried to put the word "generic" in his mouth, Dr. Rappeport referred back to what he said in his report (A494 l.17-A495 l.3, A497 l.9-A498 l.18). The proposition that

46

transparent packaging is by itself unprotectable as trade dress without more is incontrovertible (*see* pp. 28-29 and n.6*, supra*), particularly in light of KIND's admissions that transparent packaging is functional.

### 1. KIND's Survey Failed To Identify the Cause of the Alleged Confusion

According to KIND, "[t]he transparent element (though functional) is a part of the legally-protected trade dress, and if the commercial impression created by all the elements combined—including the transparent element—is leading to confusion, such confusion should be counted" (KIND Br. 41). Assuming that a functional element can be protected as a part of legally protected composite trade dress, the overall look of which is protectable, the question then becomes whether the commercial impression created by all of the elements combined—**as opposed to the unprotectable element(s) alone**—is leading to confusion. KIND's survey does not test that issue.

The issue on which the two experts actually disagreed was a survey design issue: whether Mr. Mantis should have used additional controls to identify whether unprotectable elements (such as the transparent panel or the product or flavor descriptors) rather than the "six elements that plaintiff defines as its trade dress" caused the confusion responses he reported (A186 l.8-A189 l.20). As Clif Bar's expert Dr. Rappeport testified, "It is possible when you have multi element trade dress . . . all of them collectively could be causing the confusion or individual

47

elements could be causing the confusion. And the problem [Mr. Mantis] has is that he doesn't address that because his control has none of the elements" (A460 ll.7-17).

Courts increasingly recognize the need for proper controls to establish the requisite causation.[13] Mr. Mantis himself agreed that "[i]t is now well understood and uncontroversial that causal conclusions should flow from an experimental survey design utilizing a control to scientifically eliminate survey 'noise' rather than from an evaluation of verbatim responses" to follow-up questions (A360-61 ¶ 13; A184 ll.7-18). He added, "Often a review of responses to 'why' questions will reveal latent, confounding features of the survey questions or design and will allow adjustments to correct apparent problems in a survey design" (A361 ¶ 14; A184 l.19-A185 l.5). Here, the verbatim responses to the follow-up questions in Mr. Mantis's survey revealed just such confounding features, and additional controls were needed to correct them.

In the survey conducted by Mr. Mantis, forty respondents "reported the

---

[13] *See, e.g., THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 240 (S.D.N.Y. 2010) ("[T]he control underestimates the 'noise' in the survey as it only contained a cartoon character and lacked other key unprotectable elements of the test shirts, such as a descriptive term.") (citation omitted); *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC.*, 447 F. Supp. 2d 266, 280–281 (S.D.N.Y. 2006), *aff'd*, 247 F. App'x 232 (2d Cir. 2007) ("[T]he survey does not adequately distinguish between respondents confused because of the name and those confused because the two facilities appear to offer a similar service, that is, 24-hour access.").

48

belief that the CLIF test bar [the premium CLIF MOJO bar at issue] is made by or made with the approval or sponsorship of the same company that makes KIND bars," while 17 respondents reported the belief that the CLIF control bar (a modified version of an opaque 2006 CLIF MOJO Sweet & Salty bar package (A293)) is made by or with the approval of KIND.  Mr. Mantis concluded that "15% of respondents confused the CLIF test bar with KIND bars **specifically because of their trade dress**," quoting as support twelve verbatim responses to the follow-up "what makes you say that" questions, virtually all of which refer to similarities in the "see-through packaging," "kind of packaging," "labels," "wrapper," or "package"(A240-41 ¶¶ 15-17, emphasis added).  But these responses could be referring to the concededly functional see-through packaging of the two test bars, the functional packaging showing the functional product configuration within, or some other combination of elements. The responses are inherently ambiguous.  Because Mr. Mantis's control consisted of bars in opaque wrappers, there is no way to know whether the overall combination and arrangement KIND claims as protectable trade dress prompted the "same company" responses.  As Dr. Rappeport testified, this was a fatal flaw in Mr. Mantis's survey methodology (A459 l.11 – A463 l.7; A517 l.6-A520 l.25; A 577-79).

Similarly, at least 16 of the verbatim responses in the Mantis survey (collected in DE72, App. A) refer to the common names, flavors and/or ingredients

of the test bars, which KIND admits are generic.[14]  These verbatims indicate that generic terminology on both the test bars was a "confounding feature" of Mr. Mantis's design that may well have triggered the "same company" responses.[15] The Mantis control was inadequate to filter out this "noise."  Mr. Mantis himself agreed that his survey design does not parse out confusion caused by any individual element of the trade dress, such as the term "Fruit & Nut" (A183 ll.106).

In some cases, multiple controls are needed in order to evaluate the cause of any apparent confusion.  *See* Shari Seidman Diamond, "Reference Guide on Survey Research" in *Reference Manual on Scientific Evidence* at 400 (Fed. Judicial Ctr. 3d ed. 2011) ("[I]t may sometimes be appropriate to have more than one control group to assess precisely what is causing the response to the experimental stimulus, [for example] in the case of allegedly infringing trade dress, whether it is

---

[14] KIND faults the district court judge for referencing two "irrelevant" verbatims (KIND Br. 43), but Mr. Mantis himself struggled with reading his spreadsheet, which KIND's counsel confirmed "is difficult to see in printed form" (A181 l.8-A182 l.17).  Of course, any error by the district court in connection with such minutiae would be harmless.

[15] Mr. Mantis artificially lined up the five flavors in the CLIF MOJO premium line against the five most comparable flavors in the KIND line (A247, A249), which has over 24 flavors (A92 ll.15-17), but did not use the same contrived array of parallel flavor designations in his control cell (A293).  Moreover, both of Mr. Mantis's test cells showing the products at issue prominently featured the phrase "Fruit & Nut" on several bars, but the bars in his control cell displayed the different descriptor "Fruit & Nut Trail Mix Bar" in much smaller font (*id.*; A174 l.23-A176 l.2).

the style of the font used or the coloring of the packaging."); *accord* Shari Seidman Diamond, "Control Foundations: Rationales and Approaches" in *Trademark and Deceptive Advertising Surveys* 62, 215-16 (Shari Seidman Diamond and Jerre B. Swann, eds., 2012) ("To separate the effects of several factors or product features on likelihood of confusion, it may be advisable to use more than one control cell."). The need for multiple controls in this case is obvious. The Lanham Act does not prohibit confusion in the abstract, but only confusion caused by protected source identifiers, and the equitable remedy of injunctive relief must be narrowly tailored to the cause of confusion.

In *Winner Int'l LLC*, 60 F. Supp. 2d at 68, for example, Judge Nickerson denied a preliminary injunction in a multi-element trade dress case involving The Club, an automobile steering wheel lock sold in a clear plastic package, notwithstanding his finding that the "overall appearance of plaintiff's product together with its package" was strong and distinctive trade dress. To establish a likelihood of confusion, the plaintiff industry leader relied on a survey showing that 67% of the respondents associated the defendant's lock with The Club. Judge Nickerson rejected the plaintiff's survey because it failed to identify the cause of the confusion. *Id.* at 71; *see also 24 Hour Fitness USA*, 447 F. Supp. 2d at 279-80 (rejecting plaintiff's survey showing an "adjusted" confusion rate of 23-26% because it failed to filter out confusion caused by other factors).

Mr. Mantis likewise failed to elicit whether his "same company" responses were driven by individual functional or generic elements or by the overall look of KIND's alleged trade dress. As Dr. Rappeport testified, "There is no evidence that the overall look and feel is what produces the numbers in the survey" (A520 ll.14-18). To accept Mr. Mantis' survey design would permit brand owners like KIND to gain an impermissible monopoly over unprotectable words and devices by simply alleging a multi-element trade dress commingling generic and functional elements and then arguing it is unnecessary to filter out any confusion caused by the unprotectable elements alone.

> **2.      Clif Bar's Survey Demonstrated That The Confusion Level Reported by Mr. Mantis Was Triggered by See-Through Packaging Alone**

Dr. Rappeport did not simply critique the Mantis survey. He undertook his own scientific market research to test the "confounding feature" of Mr. Mantis's survey design that seemed most obvious to him based on his forty years of experience: the fact that the KIND and premium CLIF MOJO packages have see-through wrappers while the control CLIF MOJO package has an opaque package (A575-80). Under tight time constraints (A458 ll.14-21, A480 ll.16-22), Dr. Rappeport conducted his own survey, replicating the Mantis methodology but adding additional controls to test whether the levels of confusion found by Mr. Mantis could be caused by the see-through packaging rather than the overall look

of KIND's six-element trade dress (A579-84; A467 l.15-A472 l.19; A1152).[16]  Dr. Rappeport used two different commercially available third party bars in see-through wrappers as controls, the THINK THIN bar and the TRUE BAR, which yielded "same company" responses of 26% (the same as the CLIF MOJO premium bar at issue) and 17%, respectively (A582-83).  Averaging the two results (a standard far more favorable to KIND than using the THINK THIN results alone), the net confusion rate is under 5%; using the THINK THIN results alone, the net rate is 0% (A583).  This is compelling evidence that the apparent confusion identified by Mr. Mantis is not attributable to the overall look and feel of the premium CLIF MOJO trade dress but is "solely an artifact of the common use of see-through packaging" (*id.* ¶ 9; A520).

KIND, not Clif Bar, carries the burden of proving an actionable level of confusion caused by the allegedly infringing trade dress.  Dr. Rappeport's independent research spotlights KIND's utter failure to do so.

---

[16] Due to the time limitations, Dr. Rappeport selected controls readily available on the market, rather than devising his own controls (A496 l.3–A497 l.8; A501 ll.8-17, A502 ll.12-24).  He did not know at the time he conducted his fieldwork that KIND had entered a settlement agreement with TRUE BAR purporting to license the NOTHING TO HIDE mark, or he could have modified that portion of the wrapper (A507 l.16-A508 l.15, A 516 ll.18-25).  Similarly, had time permitted, he could have also tested the impact of the generic product and ingredient names (A465 l.232-A466 l.18).

III.    **THE DISTRICT COURT CORRECTLY CONCLUDED THAT KIND HAS FAILED TO DEMONSTRATE IRREPARABLE HARM**

The District Court finding that KIND failed to show irreparable harm (SPA 23) is not clearly erroneous.[17]  "[I]rreparable injury exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its **trademark** pending trial."  *Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985) (emphasis added).

Clif Bar has clearly not infringed the KIND trademark or logo, KIND has not asserted that it owns any rights in its product or basic packaging configuration, and transparent packaging *per se* is not legally protectable.  Moreover, KIND has coexisted with Clif Bar's CLIF C, CLIF MOJO Sweet & Salty, and CLIF MOJO Dipped bars (as well as dozens of third parties' bars in transparent packaging), without objection or any apparent loss of market share.  Indeed, KIND says its market share has grown from 19.9% to 51.1% from 2009 to February 2014 (A208 ¶ 14).

Clif Bar's CEO testified to the reputational and monetary harm Clif Bar would suffer if it were forced to abort its new product launch (A738-39).  The

---

[17] In the wake of the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), "the traditional principles of equity it employed are the presumptive standard for injunction in **any** context."  *Salinger v. Colting*, 607 F.3d 68, 77-78 (2d Cir. 2010) (emphasis added).  KIND failed to demonstrate irreparable harm either with or without a presumption.

District Court credited that testimony (SPA24). For good reason, it was not persuaded by KIND's supposedly "detailed showing" of irreparable harm based on the number of impulse purchasers of its bars, who are arguably more prone to confusion (KIND Br. 13-14; A953 ll.9-12).[18]  During his testimony, Mr. Lubetzky equated the number of "impulse" purchasers with the number of convenience stores and "emerging channels" that sell KIND bars (A981 l.17-A984 l.6). On cross, however, he conceded that these two channels represent only a small percentage of KIND's sales by volume, in some of these stores KIND is the only bar offered, and there is no evidence that purchasers in these channels are in fact impulse purchasers rather than KIND's most loyal customers (A1007 l.7-A1016 l.8; A1091). The district court found that "some purchasers . . . are likely to be casual purchasers prone to impulse buying, while others are likely to be careful purchasers," and so gave "little weight to this factor in its analysis" (SPA22).

---

[18] In response to the District Court's request for hard data concerning "what percentage of purchasers are likely to purchase without having a strong brand affinity and who make the decision very quickly" (A157 l.24-A158 l.1), KIND offered a summary chart stating that 44% of KIND consumers are "first timers" who have tried a KIND bar "once, maybe twice" (A1092; A948 l.18-A941 l.8; A959 ll.6-11). But the analysis from which the data is supposedly extrapolated (A947 l.4-A948 l.24) states at CA26 that roughly 15% of KIND consumers have tried the bars "only once or twice" and at CA41 uses a different breakdown (users who "have eaten KIND only once" or "two **or more** times"). Further, the analysis indicates that 97% of KIND's sales come from consumers who purchase its bars "a few times a month" or more, and only 3% of its sales come from casual consumers (CA26, "Sales Volume Breakdown" on lower right).

KIND now seeks to establish irreparable harm based upon purely speculative confusion among the "85% of the adult consuming population [that] has never heard of KIND or are not KIND consumers at all" (KIND Br. 13-14). Yet consumers who have no familiarity with a plaintiff's trade dress are not likely to be confused. As this Court explained in *Landscape Forms*, 113 F.3d at 382-83 (citation omitted), the "general public" is only relevant to the confusion analysis "if their views are somehow related to the goodwill of the aggrieved manufacturer. Here, where there is no showing that the general public is aware of [plaintiff's] 'dress,' the district court erred in giving this factor great weight." "[T]he correct test is whether a consumer who is somewhat familiar with the plaintiff's dress would likely be confused when presented with defendant's dress alone." *Toy Mfrs. of Am., Inc. v. Helmsley-Spear, Inc.*, 960 F. Supp. 673, 681 (S.D.N.Y. 1997).

Granting KIND the extraordinary remedy of preliminary injunctive relief would hinder legitimate competition by creating uncertainty as to whether bar makers may use the functional, generic and descriptive packaging elements that characterize KIND's alleged trade dress. Consumers would suffer if they cannot see the healthy snack bars they are buying, obtain useful information to inform their purchasing decisions, or decide for themselves whether Clif Bar's delicious new CLIF MOJO bars with 70% organic ingredients are better than KIND bars, notwithstanding their lower price. Of course, "the public has an interest in not

56

being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *N.Y. City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010). But the marks the public associates with KIND do not appear on CLIF MOJO products. Clif Bar proudly brands its products with its own CLIF and MOJO marks. It has no interest whatsoever in passing them off as KIND's products.

## CONCLUSION

The District Court did not abuse its discretion in denying KIND's motion for preliminary injunction. It committed no error in accepting KIND's definition of its alleged trade dress, in concluding that KIND's claimed trade dress is not protectable, or in finding no likelihood of confusion or irreparable harm to KIND. The decision below should be affirmed.

Dated: November 3, 2014

KILPATRICK TOWNSEND
& STOCKTON LLP

Lisa Pearson (LP 4916)
Robert Potter (RP 5757)
KILPATRICK TOWNSEND
& STOCKTON LLP
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 775-8700

*Attorneys for Defendant-Appellee
Clif Bar & Company*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, <u>AND TYPE STYLE REQUIREMENTS</u>

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 13,926 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure  32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2010 in 14-point font and Times New Roman type style.

By: *<u>/s/ Lisa Pearson</u>*
       Lisa Pearson
       Attorney for Defendant-Appellee Clif Bar & Company

Dated:  November 3, 2014